Lisa OLIVER, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–61.

District of Columbia Court of Appeals.

Argued April 7, 1994.

Decided April 13, 1995.

Jo–Ann Wallace, Public Defender Service, with whom James Klein, Samia Fam, Eduardo Juarez, and Stephanie Garriga, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John R. Fisher, Roger W. Burke, Jr., and Clendon H. Lee, Jr., Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.

Opinion for the court by Associate Judge STEADMAN.

Dissenting opinion by Associate Judge FERREN at p. 1173.

STEADMAN, Associate Judge:

Appellant challenges the warrantless police entry into her home which resulted in the retrieval of a kidnapped baby. We conclude, as reflected in the trial court's ruling, that the entry and seizure of the baby were justified by emergency circumstances and hence lawful under the Fourth Amendment. The identification of the baby as the kidnapped baby sufficiently attenuated the taint of appellant's conceded illegal seizure to make appellant's subsequent confession admissible into evidence. Accordingly, we affirm appellant's conviction of the offense of kidnapping.[1]

## I. FACTS AND PROCEDURE

At approximately 1:15 p.m., on Monday, October 23, 1989, Charlotte Braxton, the nursing assistant on duty at the boarder baby[2] nursery at the D.C. General Hospital, returned from lunch and noticed that an

---

1. Appellant was sentenced to a term of three to nine years, followed by a five-year period of supervised probation. Two years of the term of incarceration were suspended, and work release recommended for the time to be served.

2. Boarder babies are abandoned babies who remain at hospitals although medically ready to be released.

eighteen-day-old baby boy was missing. When she had left for lunch, "Karen," a first-time volunteer, and Anna Denkins and Cornell Benjamin, lunch-hour volunteers from the D.C. National Guard, had been watching the babies in the nursery. Braxton informed the nurse in charge that she was leaving for lunch. While normally a member of the hospital staff was around the nursery, all three volunteers had left the nursery by the time Braxton returned from lunch and the only person present in the nursery at that time was another volunteer.

Detective Renager Lee and his partner responded to a radio run for the apparent kidnapping. Their investigation focused on appellant, Lisa Oliver, after Detective Vernon Jones received a telephone call from a Ms. Washington later in the evening.[3] Ms. Washington told the detective that she had spoken with appellant on the telephone the previous day, and that appellant had said she was going to have her labor induced. Ms. Washington explained that she had become suspicious of appellant's story when she spoke with appellant again earlier that day and appellant had told her appellant had delivered the baby at 11:00 a.m., but had brought him home immediately because of the kidnapping at D.C. General Hospital.

Sometime near midnight on October 23, an investigative team consisting of Lieutenant Biglow, Sonja Harper, Detective Hammon, and Detective Jones brought Anna Denkins to appellant's home to see whether she could identify appellant as "Karen," the nursery volunteer.[4] Denkins told the officers that appellant was heavier, shorter, and lighter-complected than "Karen" and was not the woman with whom she remembered volunteering. Denkins and the officers left appellant's home. Within the hour, however, they

---

**3.** Information given to the police by Ethel Hawkins, a hospital social worker, also might have caused the officers to focus their investigation on appellant, although it is unclear from the record precisely when the police obtained this information. At the suppression hearing, Detective Lee testified:

> On the 24th, my office received information from a social worker at the hospital, Ms. Hawkins. Ms. Hawkins indicated that she had talked to Ms. Oliver the Friday prior to the 23rd of October, at which point Ms. Oliver indicated that she had [given] birth to a baby on October 4 of 1989. And she had abandoned the baby. And while she was in the hospital, she gave the hospital a fictitious name.

When cross-examined, Detective Lee explained that he thought the call from Ms. Hawkins had been received by the police on October 23 but that his office did not receive the information until sometime during the day on October 24.

At trial, Ms. Hawkins testified that during her conversation with appellant on October 20, she had agreed to review the hospital records for an abandoned baby born on October 4 and meet with appellant on October 23 to discuss what she had found. Ms. Hawkins explained that in the morning on October 23, appellant called her to change the time of the appointment. By the time appellant called, however, Ms. Hawkins had already checked the hospital records, so she told appellant that she had no record of an abandoned baby born on October 4 and suggested that she try another hospital. Presumably, this discovery was related to the police in their subsequent interview with Ms. Hawkins.

During voir dire examination, Ms. Hawkins testified that the police had interviewed her at the hospital on October 23 and that she had given them appellant's phone number and address at that time. Although she testified that the officers had taken notes of their conversation with her on the 23rd, these notes were never described by other witnesses or admitted in evidence, so we do not know for sure whether they were part of the case file reviewed by other members of the investigative team.

The parties stipulated, however, that Defense Exhibit No. 1 was a report prepared by a police department detective after he had interviewed Ms. Hawkins on October 23. The typed report explains that "[t]he first lead was obtained from Ethel Hawkins," discusses the story that Ms. Hawkins relayed to the detective, gives appellant's name and address, and then concludes that appellant did not fit the description of "Karen." Accordingly, although neither appellant nor the government has explained whether this report was, or was not, contained in the case file reviewed by the members of the investigative team, it is probable that, given the format of the report, it was in the file. Thus, it appears that the information both Ms. Washington and Mrs. Hawkins gave the police caused the officers to focus their investigation on appellant.

**4.** Detective Lee testified at the suppression hearing that he had gone off duty at 6:30 or 7:00 p.m., on October 23 and that he had not been present when the other officers had taken Denkins to identify appellant and the baby later that evening. It is not clear from the record whether appellant, her brother, or another member of the Oliver household consented to the entries on October 23.

returned to attempt to identify the baby.[5] Denkins also could not identify the baby. She explained that the baby missing from the nursery had unusual reddish, tapered hair, whereas the baby at appellant's home had browner, curlier hair. Before Denkins and the police officers left appellant's home, appellant mentioned that Dr. Worth [6] had delivered her baby that day at Howard University Hospital.

The next morning, Detective Rufus A. Jenkins, Jr. became involved with the kidnapping investigation. After reviewing the case file and reports of the leads gathered on October 23,[7] he went to D.C. General Hospital and obtained the baby's footprint. Afterward, he went to Howard University Hospital to verify the information that appellant had given the officers the previous night. Not only did Detective Jenkins discover that no doctor named "Worth" was on the staff of Howard University Hospital, but also he discovered that appellant had not been a patient at the hospital within the past five years. He contacted Lieutenant Bolten and Sergeant Carl, the other members of his investigative team, and jointly they decided to interview appellant once again.

Detective Jenkins, Lieutenant Bolten, and Sergeant Carl knocked on the door of appellant's home at approximately 11:00 a.m., on October 24. Appellant's brother, Lamard Oliver, answered the door, and the officers told him that they wanted to speak with appellant. Mr. Oliver explained that appellant was in the basement, and then he called down to her that the police were there. Appellant responded, "Should I put on clothes?" [8] Mr. Oliver walked down the stairs into the basement, and the officers followed behind him.[9]

Detective Jenkins then confronted appellant with the information he had obtained from Howard University Hospital: that hospital records refuted her claim she had delivered a baby there the previous day, and that no doctor named "Worth" was on the hospital staff. Appellant offered no further explanation and instead in a distraught manner responded that, because the baby had not been identified the previous night, she did not know why the police just did not leave her alone. Detective Jenkins then told appellant that she had to come down to the Robbery Branch for further investigation. During this discussion, Mr. Oliver went upstairs, followed by one of the officers. Mr. Oliver had told the officers earlier that he picked up his sister at D.C. General the day before. The officer told Mr. Oliver that he had to go to the Robbery Branch too because he had picked up his sister the day before at D.C. General Hospital and therefore might be an accessory to the kidnapping.

5. It is not clear from the record whether these visits occurred before or after midnight. For purposes of this opinion, and in order not to confuse these visits with the entry at issue on October 24, we will refer to both as occurring on October 23.

6. Although Detective Jenkins testified that appellant had told the officers that Dr. Worth had delivered her baby earlier that day, he also stated, "Now the spelling that we had was W-i-r-t. Where that spelling came from, I don't know."

7. Because the case file and reports were not admitted into evidence and none of the witnesses testified as to what information the reports they reviewed contained, we do not know precisely what information these officers acquired from the previous day's investigation.

8. This was the testimony of appellant and her brother. Detective Jenkins testified at the suppression hearing that Mr. Oliver "called downstairs, 'Lisa, police here, they would like to talk to you.' And she told him to have us come on down." In its order following our remand, see note 9, infra, the trial court apparently credited appellant's and Mr. Oliver's version of the facts, although it is not entirely clear whether, in the trial court's view, appellant may not have also said what Detective Jenkins testified to.

9. On April 22, 1994, we remanded the record to the trial court for supplemental findings of fact and conclusions of law regarding the possibility that the police officers' October 24 entry into appellant's home and bedroom was consensual. The trial court issued supplemental findings of fact and conclusions of law on May 6, 1994, holding that the entry was consensual, and incorporated them in the record. We do not reach this issue. See note 11, infra. We do note that in minor respects, the trial court's findings are inconsistent with, or less detailed than, the record. Where we believe it is important for the sake of accuracy or completeness to base our factual presentation on the record, rather than on the trial court's findings, we do so.

Appellant, who had been wearing a gown and possibly a housecoat, dressed herself and the baby while the two officers waited on the other side of the room. After appellant had dressed, Detective Jenkins escorted her outside and placed her in his unmarked police car. Lieutenant Bolten took the baby and placed him in another unmarked police car with Mr. Oliver. When appellant protested that she wanted the baby to go with her, Detective Jenkins explained that they were taking the baby to the hospital for identification and that the baby would be returned to her if he was not identified.

When they reached the Robbery Branch at approximately noon, Detective Jenkins took appellant to a small interrogation room. He advised her of her *Miranda*[10] rights; however, he told her that she was not under arrest. Detective Jenkins then confronted appellant again with the fact that the records at Howard University Hospital could not confirm the information she had given him regarding the baby's birth. Appellant responded that she had actually gone into labor at the Upper Cardozo Clinic and that the doctor there had referred her to Providence Hospital. Detective Jenkins called Providence Hospital, and there was no record of appellant's delivery. When confronted with this information, appellant told Detective Jenkins that she had delivered the baby at Prince George's General Hospital. While Detective Jenkins was on the telephone with Prince George's General Hospital, Lieutenant Bolten called to tell him that medical personnel at D.C. General Hospital had identified the baby. Soon afterward, Prince George's General Hospital confirmed that appellant had not given birth there.

Between 12:30 and 1:00 p.m., Detective Jenkins told appellant that the baby had been identified, readvised her of her *Miranda* rights—which appellant waived—and placed her under arrest. For the next hour, she was questioned by several police officers, who encouraged her to make a statement. Appellant then met privately with her boyfriend for ten to fifteen minutes and afterward met with her brother, Mr. Oliver, for approximately the same amount of time.

When Mr. Oliver left the interrogation room, both he and appellant had tears in their eyes. Mr. Oliver walked past Detectives Jenkins and Hardisty, and told them that appellant was ready to talk.

Detective Jenkins entered the interrogation room with Detective Hardisty, consoled appellant, and asked her whether she was willing to give a statement. Appellant responded affirmatively. First, she orally admitted taking the baby from D.C. General Hospital, and then she agreed to make a written statement. Detective Jenkins began typing appellant's four-page statement at 2:15 p.m. He and appellant both signed the completed statement at 2:45 p.m.

The trial court held a suppression hearing. During this hearing several witnesses for both the defense and the prosecution testified. The main issues for the court were whether (1) Ms. Oliver voluntarily went to the police station; (2) the baby was seized in violation of the Fourth Amendment; (3) the confession should be suppressed as the fruit of a poisonous seizure; and (4) the validity of the lineup. The trial court found that Ms. Oliver did not voluntarily go to the police station, but rather was detained. The government conceded that at the time the police took Ms. Oliver to the police station there was no probable cause for arrest. The trial court was inclined to rule that the seizure of the child was lawful, but reserved final ruling until later. The court also reserved ruling on the legality of the confession and the lineup based on the product of an unlawful arrest until later. However, the court denied the suppression of the lineup based on suggestivity. Finally, the court suppressed the statements made by Ms. Oliver at the police station prior to the confession.

After briefing by the parties, the trial court ruled on those aspects of the suppression motion it had reserved for further consideration. The court concluded that the seizure of the baby was reasonable and lawful, relying, as we understand it, on the exigent circumstances presented. Based on the identification of the baby as the missing child from the hospital, the court concluded

**10.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

that when the police were informed of this information they had probable cause to arrest Ms. Oliver. According to the court, Ms. Oliver's confession followed the police acquisition of that additional information and had been made after she had been advised of her *Miranda* rights. The court concluded that "there was a significant event independent of the initial unlawful seizure which made possible the taking of the alleged confession." Since the seizure of the child was lawful and therefore the additional evidence leading to Ms. Oliver's continued detention was not the product of any unlawful police activity, the court denied the defense motion to suppress the identification of the missing baby, the confession, and the lineup identifications of the appellant.

## II. EMERGENCY EXCEPTION TO THE WARRANT REQUIREMENT

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. AMEND. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 2096, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Fourth Amendment law presumes that warrantless searches and seizures inside a home are unreasonable absent exigent circumstances. *Payton v. New York,* 445 U.S. 573, 586, 590, 100 S.Ct. 1371, 1380, 1382, 63 L.Ed.2d 639 (1980). Otherwise put, searches and seizures without a warrant "'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"

*Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)).

One exception to the warrant requirement is in "exigent circumstances" where the situation presents compelling factors such that entry cannot be delayed. *United States v. Booth,* 455 A.2d 1351, 1354 (D.C.1983). Although normally this exception involves "hot pursuit" of a known offender, or likely destruction of evidence, one subset of such exigent circumstances, known as the "emergency" exception, acknowledges the need to protect a person inside the premises who is reasonably believed to be in peril. *Earle v. United States,* 612 A.2d 1258, 1263 (D.C. 1992); *Booth, supra* 455 A.2d at 1354–55. The emergency exception allows police officers to make a warrantless entry and search when they reasonably believe that a person within the home is in need of immediate aid. *Mincey, supra,* 437 U.S. at 392, 98 S.Ct. at 2413. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S.App.D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), *quoted in Mincey, supra,* 437 U.S. at 392–93, 98 S.Ct. at 2413. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967).

The trial court here manifested in its pretrial ruling [11] that the warrantless en-

11. On appeal, the government realized that we might not agree that the emergency exception justified the warrantless entry and seizure. The government accordingly argued that, if we had doubts about application of the emergency exception, the government should be allowed to argue that consent justified the entry and seizure. We remanded the record at the government's suggestion for findings as to consent. See note 9, *supra.*

The trial court on remand did indeed find, as an alternate ground for admitting the disputed

evidence, that the entry had been consensual. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (individual can waive the warrant requirement by consenting to a search and seizure); *Judd v. United States,* 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951) (same). Since we agree with the trial court's original determination that the entry, if nonconsensual, was justified under the emergency doctrine, we need not reach the consent issue. We do note, however, as hereinafter

try of the police and the seizure of the baby were justified under this emergency exception to the warrant requirement. We must accept the trial court's factual determinations relating to exigent circumstances unless clearly erroneous. *Derrington v. United States,* 488 A.2d 1314, 1323 (D.C.), *recall of mandate denied,* 509 A.2d 605 (D.C.1985), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). However, appellate "deference to the trial court ... is limited to its factual findings." *Booth, supra,* 455 A.2d at 1355 n. 5; *United States v. Harris,* 629 A.2d 481, 488 (D.C.1993); *United States v. Minick,* 455 A.2d 874, 880 n. 6 (D.C.) (en banc), *cert. denied,* 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983). "Facts being what they are, however, they must be examined in the context and sequence in which they occur." *Washington v. United States,* 585 A.2d 167, 168 (D.C.1991). "[T]he ultimate determination as to whether exigent circumstances justified a warrantless entry remains a conclusion of law, which we decide *de novo.*" *Harris, supra,* 629 A.2d at 488. Thus, as a subset of the exigent circumstances exception the emergency exception is also ultimately reviewed *de novo* with due deference to the trial court's factual findings.

■ The principles governing the application of the emergency exception as interpreted by prior case law in the District of Columbia were set forth in *Booth, supra,* 455 A.2d at 1351. Warrantless entry in an "emergency" requiring preventive action may be permitted by the exception if a person inside the premises is reasonably believed to be in danger even though no crime has necessarily been committed. *Id.* at 1354.[12] Three criteria must be met to satisfy the requirements of the emergency doctrine.

First, the police officer must have probable cause, based on specific, articulable facts,

to believe that immediate entry is necessary to assist someone in danger of bodily harm inside the premises. Second, the entry must be tailored carefully to achieve that objective, the officer can do no more than is reasonably necessary to ascertain whether someone is in need of assistance, and then to provide that assistance. Finally, the entry must not be motivated primarily by the intent to arrest or to search, but by an intent to investigate a genuine emergency and to render assistance.

*Id.* at 1355–56 (citation and footnotes omitted).

■ We examine each of those requirements under the facts here as found by the trial court, keeping in mind that "[i]n reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C. 1991) (en banc). We also keep in mind the repeated admonition of the Supreme Court that determinations under the Fourth Amendment " 'deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)).

Specifically,

[p]robable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine "philosophical concept in a vacuum," *Bell v. United States,* 102 U.S.App.D.C. 383, 386, 254 F.2d 82, 85 (1958), but rather it requires a pragmatic analysis of "every day life on which reasonable and prudent men,

---

indicated, that the nature of the entry, nonviolent and if not strictly consensual at least very close to that, is relevant in assessing the application of the emergency doctrine. This is not a case where the police battered down the home's front door in the middle of the night.

**12.** The emergency exception is a subset of the exigency exception to the warrant requirement. *Earle, supra,* 612 A.2d at 1263. "The purpose of the exigency exception is to protect officers, by-

standers, and identified evidence, and to secure suspects; it is not to facilitate exploration, or obtainment of evidence to verify mere suspicions." *Washington, supra,* 585 A.2d at 170. Two of these, hot pursuit and destruction of evidence, do not involve protecting a person and, although falling within the exception, are lesser emergency situations than saving or protecting a person.

not legal technicians act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) *United States v. Davis,* 147 U.S.App.D.C. 400, 402, 458 F.2d 819, 821 (1972). " '[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Gates, supra,* 462 U.S. at 232, 103 S.Ct. at 2329 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Likewise, we are mindful that "the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall,* 174 U.S.App.D.C. 13, 15, 525 F.2d 857, 859 (1976). "[T]he totality of the circumstances—the whole picture—must be taken into account." *Cortez, supra,* 449 U.S. at 417, 101 S.Ct. at 694. As one court has noted "[v]iewed singly these [facts and circumstances] may not be dispositive, yet when viewed in unison the puzzle may fit." *Davis, supra,* 147 U.S.App.D.C. at 402, 458 F.2d at 821.

### A. PROBABLE CAUSE

■ We begin by examining the concept of "probable cause" as it relates to the application of the emergency doctrine. In that context, we interpret "probable cause" to mean "reasonable grounds to believe"—a formulation that says what we think the Supreme Court meant by "reasonable belief" in *Mincey, supra,* 437 U.S. at 392, 98 S.Ct. at 2413; a formulation that reflects the need for solid facts warranting probable cause, not mere reasonable suspicion (as in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); a formulation that is commonly used to mean probable cause, *see* 2 W.R. LaFave, Search and Seizure § 6.6(a), at 698–99 (2d ed. 1987) (equating "reasonable grounds to believe that some kind of emergency existed" with a "probable cause requirement"); and a formulation that fits well with a perceived emergency, in contrast with a basis for prospec-

tive arrest, for which "probable cause" is the traditional language.

■ We now turn to examine precisely what the officers knew when they arrived at appellant's home on October 24. Detective Jenkins testified at the suppression hearing that he and the other members of his investigative team (Lieutenant Bolten and Sergeant Carl) had decided to interview appellant for the third time when they discovered, on the morning of October 24, that the information appellant had given to the previous day's investigative team (Lieutenant Biglow and Detectives Hammon and Jones) about the birth of the baby could not be confirmed at Howard University Hospital. Detective Jenkins also testified that, when he became involved with the kidnapping investigation on October 24, he reviewed the case file, including the reports of the leads gathered the previous day.[13] Although the case file was not introduced into evidence and Detective Jenkins never testified as to the file's contents, we may reasonably assume, pursuant to *Peay, supra,* that the file contained (1) the information from Ms. Washington that appellant had told her the unlikely story that appellant had delivered the baby at 11:00 a.m., on October 23 but had brought him home immediately because of the kidnapping at D.C. General Hospital; (2) the information from Ms. Hawkins that appellant had called her on October 20, explaining that she had given birth to a baby on October 4, and had abandoned the baby but now wanted him back, but that the hospital records contained no information of an abandoned baby born on that date; (3) a report from the officers' first visit to appellant's home on October 23, when volunteer Denkins failed to identify appellant as "Karen"; (4) a report from the officers' second visit to appellant's home on October 23, when Denkins failed to identify the baby; and (5) the information that appellant had told the police during the October 23, visits that she had delivered the baby earlier that day at Howard University Hospital attended by Dr. Worth.[14]

---

13. See *supra* at 2–4 & n. 3.

14. Even if all this information was not contained in the case file, it all had been received by other officers working on the kidnapping investigation

and thus was imputable to Detective Jenkins, Lieutenant Bolten, and Sergeant Carl through the collective knowledge doctrine. *See In re M.E.B.,* 638 A.2d 1123, 1128–33 (D.C.1993), *cert.*

On the morning of October 24, Detective Jenkins went to Howard University Hospital to verify appellant's explanation of the baby's birth. He discovered that the hospital employed no doctor named "Worth" and that appellant had not been a patient at the hospital within the past five years. The discovery that appellant had provided a false exculpatory statement to the police investigators dramatically changed the whole equation. The collapse of appellant's story introduced a new element of urgency. It would seem remarkable that a new mother would lie about where she gave birth. The new information seemed to confirm the strange pattern of conduct reported by Ms. Washington and Ms. Hawkins. Now there were reasonable grounds to believe that the baby was the kidnapped baby; the impelling need was for further access to mother and baby. Since unlike an older kidnap victim the baby could not speak to identify itself, identification through other means had to be the ultimate determinative factor whether the baby was the kidnapping victim; that is, which could convert probable cause into certainty.

The failure the previous night to identify appellant as "Karen" or the baby as the boarder baby does not abrogate this analysis. Sergeant Denkins had no reason whatever to think at the time of her earlier acquaintance with either Karen or the baby that she would be called upon to make a positive identification of either of them at a later time. Furthermore, given the shifting and uncertain personnel in the nursery, Karen was not the only individual who might have absconded with the infant.

It is true that this case is unlike the typical emergency exception where blood at the scene, gunshots, or cries for help will give the police "probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm," *Booth, supra,* 455 A.2d at 1355. However, kidnapping investigations present unusually compelling circumstances for emergency analysis.[15] As the trial judge noted, police seizure of a suspected kidnapping victim, not least of all a helpless infant, is unlike the seizure of drugs or other property for evidentiary purposes. The life, freedom and future of a human being is at stake. The victim, even if presently being adequately cared for and safe, could at any moment be harmed or be absconded to a point beyond discovery. An infant in particular could thus be placed beyond the legal protections to ensure future custody and treatment in its best interests. As the trial court noted, police officers have an obligation to protect human beings and this duty is even greater when a helpless and defenseless infant is involved. In short, a kidnap victim may be deemed inherently endangered.

Other jurisdictions have reflected these unique qualities of kidnapping in holding that kidnapping may create exigent or emergency circumstances, even without direct evidence of a threat of bodily harm to the victim. *See People v. Thiret,* 685 P.2d 193, 200 (Colo. 1984) (en banc) (finding exigent circumstance when a "three-year-old child had recently been abducted, her life could well have been in danger, and the Sheridan police were engaged in efforts to determine her whereabouts"); *Benefiel v. State,* 578 N.E.2d 338, 345 (Ind.1991) (finding emergency situation when a 17 year-old kidnapping and rape vic-

*denied,* —— U.S. ——, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994). Furthermore, although testimony at the suppression hearing failed to prove that the police had received the information from Ms. Hawkins on October 23, we are satisfied that both Ms. Hawkins' testimony at trial and Defense Exhibit Number 1, see *supra* note 2, established that police officers involved in the investigation had obtained this information on October 23. *See Martin v. United States,* 567 A.2d 896, 902 n. 16 (D.C.1989) (undisputed trial testimony may be considered with evidence presented at suppression hearing); *Rushing v. United States,* 381 A.2d 252, 257 (D.C.1977) (same).

15. The Supreme Court repeatedly has warned that the seriousness of the offense under investigation cannot itself be a factor creating an emergency justifying a warrantless search. *See Thompson v. Louisiana,* 469 U.S. 17, 21, 105 S.Ct. 409, 411, 83 L.Ed.2d 246 (1984); *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732 (1984); *Payton, supra,* 445 U.S. at 583–90, 100 S.Ct. at 1378–82; *Mincey, supra,* 437 U.S. at 394, 98 S.Ct. at 2414. Our decision here rests on the ongoing risk to the victim created by the nature of the crime. The prohibition is aimed not at this type of situation but rather at investigations of crimes which no longer threaten the lives of the victims.

tim's life is in danger), *cert. denied,* — U.S. —, 112 S.Ct. 2971, 119 L.Ed.2d 591 (1992); *Johnson v. State,* 554 P.2d 51, 54 (Okla.Crim. App.) (finding exigent circumstances in kidnapping case in "hopes of saving a human life" when police suspected that elderly man being held in a trunk of an automobile during cold days), *cert. denied,* 429 U.S. 943, 97 S.Ct. 364, 50 L.Ed.2d 314 (1976); *People v. Diaz,* 170 A.D.2d 618, 566 N.Y.S.2d 391, 392 (N.Y.App.Div.1991) (finding emergency situation when father allegedly kidnapped four-year-old son because the "safety of the child was potentially in jeopardy"), *appeal denied,* 79 N.Y.2d 855, 580 N.Y.S.2d 727, 588 N.E.2d 762 (1992).

A recent case in our neighboring jurisdiction involved a report that a man and woman had been missing for eighteen hours. *Burks v. State,* 96 Md.App. 173, 624 A.2d 1257 (Ct.Spec.App.), *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993). An officer spotted the man's car outside a motel room and through a gap in the curtains saw a fully clothed man and woman lying on top of one bed and a third person lying face down on the other bed; all three appeared to be asleep. *Id.* 624 A.2d at 1267. The trial judge acknowledged that "there was no blood on the scene. There were no signs of injury or struggle. The room was not ransacked from anything that [the officer] could tell, nor did he have any information as to the identity of the perpetrator, or as to whether this person was armed." *Id.* 624 A.2d at 1270. Nevertheless the trial court ruled, and the appellate court affirmed, that for the officer "to have waited to get a warrant or to have called the room to say 'are you all right in there' would have been ill-advised, and may well have resulted in serious injury or escape." *Id.* Thus, the officer's warrantless entry was permissible under the exigent circumstances exception. *Id.*

In another recent case, after determining that defendant was wanted for child snatching, officers returned to defendant's apartment where they had seen a child matching the description of the missing boy. *State v. Collins,* 543 A.2d 641, 651 (R.I.1988). The court found:

> that the discovery that the possible presence in a suspect's apartment of an infant victim of a child snatching or kidnapping created an emergency or exigent circumstance permitting a warrantless entry into said apartment.... To expect the police to secure a warrant while the infant remained alone in the apartment or, worse, was removed therefrom by a confederate of defendant strains credulity.

*Id.* at 652. Likewise here, it is unreasonable to expect police to leave the victim in the control of the captor while the officers obtain a warrant. This is true even if the victim apparently is being well treated. A person's status as a kidnapping victim places him or her in continuing danger of harm at the hands of his or her captor. We will not hold that the police must delay rescue to obtain a warrant if probable cause exists to believe that a kidnapping victim is being held inside the premises. In such a situation, time is of the essence.

We do not think that this case is in any way controlled by the prosecutor's perhaps unwarranted concession [16] at the suppression hearing that the police officers did not have probable cause to arrest appellant for kidnapping at the time they took her from her home to the Robbery Branch:

> I don't think probable cause for the arrest existed at that time, *basically because of the fact that there had been the misidentification.*[17] [The officers] had to continue with their investigation. There had to be further questioning of Ms. Oliver.

(Emphasis added.) We may accept for present purposes that a prosecutor's concession of no probable cause "precludes our considering" the record facts ourselves to determine whether the probable cause standard was

---

**16.** It is worth noting that the prosecutor made this concession in circumstances where the government's principal argument was that the appellant had voluntarily accompanied the police to the station.

**17.** The prosecutor was referring to Sergeant Denkins' observations on October 23 that appellant was not "Karen," who had been in the nursery just before the kidnapping, and that appellant's baby was not the infant who had been taken from the hospital.

actually satisfied. *Arizona v. Hicks*, 480 U.S. 321, 326 n.*, 107 S.Ct. 1149, 1153 n.*, 94 L.Ed.2d 347 (1987). However, probable cause to arrest appellant for kidnapping and probable cause to believe that the baby was an endangered baby are separate questions.[18] "The right to search and the validity of the seizure are not dependent on the right to arrest." *Carroll v. United States*, 267 U.S. 132, 159, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925). "Probable cause to search is not the same as probable cause to arrest." *State v. Doe*, 115 N.H. 682, 371 A.2d 167, 169 (1975).

As one court has noted: "the probable cause determination made by a magistrate considering a search warrant application is not identical to that made by a magistrate when deciding whether or not to issue an arrest warrant." *People v. Johnson*, 431 Mich. 683, 431 N.W.2d 825, 828 (1988). The court described the difference as follows:

> It is generally assumed that the same quantum of evidence is required whether one is concerned with probable cause to arrest or probable cause to search. But even if this is so, it does not follow that probable cause for arrest and probable cause for search are identical in all respects. Each requires a showing of probabilities as to somewhat different facts and circumstances, and thus one can exist without the other.

*Id.* 431 N.W.2d at 828 (quoting 1 WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE, § 3.3, at 184–85 (1984) (footnotes omitted)).

It is a "general proposition that a search warrant, unlike an arrest warrant, may issue, without the slightest clue to the identity of the criminal, if there is probable cause to believe that fruits, instrumentalities or evidence of criminal activity are located at the place to be searched." *United States v. Webster*, 750 F.2d 307, 318 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); *see also United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir.1983), *cert. denied*, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); *State v. Toler*, 246 Kan. 269, 787 P.2d 711, 715 (1990); *Commonwealth v. Pignone*, 3 Mass.App. 403, 332 N.E.2d 388, 392 n. 9 (1975). Defendants sometimes confuse the need for probable cause to search a premises with the need for probable cause to arrest the defendant. *State v. Caicedo*, 135 N.H. 122, 599 A.2d 895, 897 (1991).

In *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979), the appellant argued that in order for a search "warrant to have been proper there had to have been probable cause to believe that he was responsible for the explosion." Under this theory "the search of appellant's home was improper unless the police had sufficient evidence prior to the search to arrest him." *Id.* 596 F.2d at 496. The court rejected this argument. Instead the court concluded that one could have probable cause to search without having probable cause to arrest. *Id.* at 496. In another case the police suspected a man of raping and killing a woman. *Doe, supra*, 371 A.2d at 167. The police had a suspect, but did not have enough evidence to arrest. The trial court issued a warrant for hair, saliva and blood samples in order to help identify the assailant. The Supreme Court of New Hampshire concluded that the search warrant was justified because probable cause to search is different than probable cause to

---

18. We note that probable cause to arrest and probable cause to enter and search have different emphases, although they apply the same general principle. *United States v. Dawkins*, 305 U.S.App.D.C. 83, 87–88, 17 F.3d 399, 403–04 (1994); *see also Gates, supra*, 462 U.S. at 230, 103 S.Ct. at 2328 (articulating totality of the circumstances test for probable cause to search); *United States v. Lincoln*, 301 U.S.App.D.C. 194, 196, 992 F.2d 356, 358 (1993) (using totality of the circumstances test for probable cause to arrest). Furthermore, we recognize that probable cause is a "'practical, nontechnical conception'" to be applied by reasonable and prudent persons, not legal technicians. *Gates, supra*, 462 U.S. at 231, 103 S.Ct. at 2328 (quoting *Brinegar, supra*, 338 U.S. at 176, 69 S.Ct. at 1311). It is one thing to deprive a person of liberty and another to deprive that person of the untrammeled possession of physical space or of a particular item of property. We fully recognize the intense trauma of the deprivation of a mother of her baby, but that deprivation here was promised to be brief if unjustified and a true mother might well empathize with the urgency of investigation of a baby kidnapping if the situation were reversed.

arrest. *Id.* at 169. Thus, as one court has noted "it would be unwise to treat the presence of a search warrant for a suspect as a judicial finding of probable cause to arrest." *People v. Johnson, supra,* 431 N.W.2d at 828. It would also be unwise to treat the prosecutor's concession that the police did not have probable cause to arrest Ms. Oliver as a judicial finding of no probable cause to seize the baby for identification under the emergency exception analysis.

The information learned from Howard University Hospital on October 24, when added to the reports previously received from Ms. Washington and Ms. Hawkins, see *supra* at 1160–61 & n. 3—all reflecting appellant's inconsistent stories, and thus apparent lies, about the baby in her home—created probable cause. Once the police discovered that the baby had not been born to appellant as she claimed, the officers had probable cause to believe that the baby had been kidnapped. The discovery of appellant's lie changed the circumstances significantly, but the prior misidentifications still left some doubt about whether appellant was the baby's rightful custodian. Nevertheless, a police officer reasonably could have believed that although he did not have probable cause to arrest appellant without further information, he did have probable cause to be concerned for the baby's safety and to justify obtaining a final and positive identification of the baby at the hospital.

In sum, in this case the police officers had "probable cause,"—*i.e.,* there were reasonable grounds to believe—"based on specific, articulable facts[ ] ... that immediate entry [was] necessary to assist someone in danger of bodily harm inside the premises." *Booth, supra,* 455 A.2d at 1355–56.

## B. CAREFULLY TAILORED ENTRY

Next, we examine whether the entry was tailored carefully to provide assistance in the emergency. An officer can do no more than is reasonably necessary to ascertain whether someone inside the premises is in need of assistance, and then to provide that assistance. *Id.* at 1356. The fact that the victim is an infant affects the equation. If the victim were a person of more than tender

years, that person could not only have called for help when the police entered, but also could have identified him or herself and testified to what happened. Normally, the officer could determine whether a person is the victim of a kidnapping by simply speaking with the person. *See Burks, supra,* 624 A.2d at 1270 (adult kidnapping victim identified appellant as "the one who kidnapped us" when police officer entered motel room); *Collins, supra,* 543 A.2d at 645 (13 year-old boy identified himself to police upon his rescue); *cf. Benefiel, supra,* 578 N.E.2d at 343 (17 year-old kidnapping and rape victim identified herself at hospital following her separation from appellant). However, where a very young infant is concerned, the only way to ascertain whether the baby is in need of assistance and to provide assistance is to identify the child and, if it has been kidnapped, to return it to its parent or guardian, in this case, the hospital. Because here the victim was a baby, the police could not rely on such information to determine whether the child was in need of rescue. Therefore, the police needed to identify the baby by other means.

Entering the home and taking the baby to the hospital was narrowly tailored to achieve identification and rescue. The police did not search for any evidence of the crime such as the clothes she may have worn to the hospital. Rather, they merely asked Ms. Oliver some follow-up questions and took the baby for identification. The entire encounter was conducted in a peaceful manner.

Here, essentially the same factors which established probable cause to believe the baby was in danger prevented the officers from simply being able to knock on the door and request that the baby be brought to them for identification. The appellant had already told the officers a plain lie about the baby. She knew that with investigation they might discover the falsity of her story. At that point in time, if appellant had not already fled with or harmed the baby, she would have had additional reason and opportunity to do so if the police appeared on her doorstep again. Once the officers entered the home and discovered that appellant was downstairs, presumably with the baby who

was not otherwise in sight, they had a duty to enter the basement to ascertain that the baby was unharmed and prevent its abscondence. They did so simply by following appellant's brother, who did not object, down the stairs. *Cf. United States v. Mejia,* 953 F.2d 461 (9th Cir.1991) (officers followed wife into husband's bedroom without express permission; permissible since reasonable person would have otherwise voiced objection), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992). The scope of their entry was thus " 'strictly tied to and justified' by the circumstances." *Booth, supra,* 455 A.2d at 1356 (quoting *Warden, supra,* 387 U.S. at 310, 87 S.Ct. at 1651 (Fortas, J. concurring)). *See Earle, supra,* 612 A.2d at 1264 (finding an emergency exception for warrantless entry).

The police questioned appellant in a final attempt to satisfy themselves regarding the identity of the baby. Appellant provided no alternate explanation at that point, but merely blurted out emotionally that she did not know why the police would not leave her alone especially in light of the fact that the baby was not identified the night before. This reaction gave the police additional probable cause to seize the baby. Only when appellant failed to satisfactorily explain the previous falsehood did they separate the baby from appellant, a separation that would be of short duration if the baby were not a kidnap victim.[19]

### C. MOTIVATION FOR ENTRY

Finally, we must determine whether the officers' entry was motivated primarily by the intent to arrest or to search, or by an intent to investigate and to render assistance in an emergency. *Booth, supra,* 455 A.2d at 1356. The officers' testified that they did not enter the home with the intent to arrest appellant, but rather to speak with her again to ascertain the baby's identity. They did not intend to search the home for evidence that appellant had kidnapped the baby from D.C. General Hospital. Instead, they entered in order to speak with appellant to determine whether the baby was in fact the kidnapped baby and therefore in need of immediate assistance. *See id.* (finding proper intent); *Earle, supra,* 612 A.2d at 1264 (same). Implicit in the trial court's analysis during the suppression hearing and ruling was a finding that the officers' motivation for entering the house was to identify and rescue the baby and to find Ms. Oliver's reaction to her Howard Hospital story being discovered as fabrication. Accordingly, since the three *Booth* criteria are met in this case and the warrantless entry did not violate the Fourth Amendment, we sustain the trial court's ruling that the seizure of the baby was lawful and its identification admissible in evidence.[20]

### III. ATTENUATION OF THE TAINT OF THE ILLEGAL SEIZURE

As we noted above, the prosecutor conceded at the suppression hearing that the police officers did not have probable cause to arrest appellant for kidnapping at the time they took her from her home to the Robbery Branch, and we may assume that this concession "precludes our considering" the record facts ourselves to determine whether the probable cause standard was actually satisfied. *Hicks, supra,* 480 U.S. at 326 n.\*, 107 S.Ct. at 1153 n.\*. We turn, therefore, to the only remaining question: whether the taint of the illegal seizure was sufficiently attenuated to admit appellant's confession and the subsequent lineup identifications into evidence. We agree with the trial court that

---

19. We are not impressed with the argument that the police should have undertaken the positive identification process at appellant's home, a clumsy process at best. We cannot say that the police determination that this should be conducted at the hospital, with its experienced personnel and records, was constitutionally impermissible.

20. We note that the identification of the baby may be admissible under the holdings in *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), and *United States v. Ceccoli-*

ni, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). In *Crews,* the majority held that a defendant's face cannot be suppressed as fruit of a poisonous arrest. In *Ceccolini,* the majority held that a witness, who is an independent actor with free will, is often substantially attenuated from an illegal search where the witness is discovered to allow the testimony or identification. The baby in this case is an independent witness whose identification by other means is being resorted to since the baby cannot itself speak.

the intervening identification of the baby, coupled with the totality of circumstances here, constituted such attenuation.

■ We recently had occasion to recapitulate the relevant legal principles. *Patton v. United States,* 633 A.2d 800, 816–17 (D.C. 1993). Evidence which has been obtained by the police through unlawful means generally must be suppressed as "fruit of the poisonous tree." This rule applies to both physical evidence and testimonial evidence. *Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). If, however, " 'an intervening event or other attenuating circumstance purge[s] the taint of the initial illegality,' " the evidence need not be suppressed. *United States v. Wood,* 299 U.S.App.D.C. 47, 52, 981 F.2d 536, 541 (1992) (quoting *United States v. Jordan,* 294 U.S.App.D.C. 227, 231, 958 F.2d 1085, 1089 (1992)). The government bears the burden of proving "that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality." *Id.* at 52, 981 F.2d at 541.

The underlying inquiry is whether a confession made after the improper seizure is a product of free will. *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

> The question whether a confession is a product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test [as "the *per se* or 'but for' rule"]. The

*Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the [illegal] arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Id.* at 603–04, 95 S.Ct. at 2261–62 (citation and footnotes omitted). "The relative importance of each of these factors in any particular case of course depends on the circumstances of that case." *United States v. Cherry,* 759 F.2d 1196, 1211 (5th Cir.1985).[21]

Unquestionably, as the trial court observed, the key intervening circumstance here was the lawfully obtained positive identification of the baby at the hospital as the baby which had been kidnapped the previous day and its aftermath.[22] This devastating information was conveyed to Ms. Oliver and she was formally placed under arrest.[23] Thereafter, following further questioning, she was allowed to talk in private with her boyfriend for ten or fifteen minutes, and to her brother for fifteen to twenty minutes. The meeting with the brother appears to have been very emotional since appellant was crying upon its conclusion. At that point, appellant gave the confession, which the trial court found to be voluntary but which she seeks to suppress.

Turning to other factors illustrated in *Brown,* we note that on three separate occasions Ms. Oliver was given *Miranda* warnings and waived her rights. These three

---

**21.** In *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), a case bearing similarities to the one now before us, the Supreme Court again addressed a number of factors in determining whether adequate attenuation occurred. Although the Court held, 5–4, that attenuation had not been shown, a singular difference in *Taylor* was that the subsequently obtained evidence which led to the confession was itself the fruit of the illegal arrest.

**22.** Many courts have found that the acquisition of probable cause through independent means is a powerful factor to purge the taint of an earlier arrest. *See, e.g., Cherry, supra,* 759 F.2d at 1212 and cases cited; *State v. Reffitt,* 145 Ariz. 452,

702 P.2d 681, 688 (1985); *State v. Stevens,* 574 So.2d 197, 204 (Fla.Dist.Ct.App.1991); *State v. Barry,* 86 N.J. 80, 429 A.2d 581, 585, *cert. denied,* 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981).

**23.** During the suppression hearing defense counsel conceded that probable cause existed to arrest Ms. Oliver upon the identification of the baby, but argued that since the baby was illegally seized the identification of the baby as the kidnapped child giving the police probable cause to arrest Ms. Oliver taints the confession. Inherent in this argument is the concession that without the unlawful seizure of the baby the confession need not be suppressed.

instances were upon her arrival at the police station for questioning, when she was formally placed under arrest, and prior to giving her official statement (the confession). Thus, appellant was adequately apprised of her constitutional rights and voluntarily spoke with the police. At least three hours passed between the unlawful arrest and the confession. Furthermore, looking at the officers' conduct during the illegal arrest, there is no claim of coercion or brutality. Weapons were never displayed and Ms. Oliver was never handcuffed. The initial seizure, albeit unlawful, was mild and carried out with consideration of its tentative nature pending identification of the baby.

In short, the totality of the circumstances leads us to conclude that the confession was " 'sufficiently an act of free will to purge the primary taint.' " *Brown, supra,* 422 U.S. at 602, 95 S.Ct. at 2261 (quoting *Wong Sun, supra,* 371 U.S. at 486, 83 S.Ct. at 416). *See Patton, supra,* 633 A.2d at 817.

*Affirmed.*

FERREN, Associate Judge, dissenting:

There was neither an emergency, as defined by the case law, nor consent to a warrantless entry. The trial court accordingly erred in denying the motion to suppress the identity of the baby and the confession ultimately taken from appellant at the police station. Specifically, the baby's identification was not lawfully before the court because the police violated appellant's constitutional rights in entering her home to take the baby and, thus, in obtaining the resulting identification. Appellant's confession also was not lawfully in evidence because it followed a concededly unlawful arrest, without sufficient attenuation of that taint to allow its admissibility. Absent this evidence, there was no basis for conviction, and reversal is therefore required.

## I. EMERGENCY EXCEPTION TO THE WARRANT REQUIREMENT?

### A.

I agree with my colleagues that the "probable cause" requirement under the emergency exception to the warrant requirement, as elaborated in *United States v. Booth,* 455 A.2d 1351, 1355–56 (D.C.1983), and succeeding cases, "reflects the need for solid facts," *ante* at 1166, showing "reasonable grounds to believe some kind of emergency existed." *Ante* at 1166 (quoting W.R. LaFave, Search and Seizure § 6.6(a), at 698 (2d ed. 1987)). On this record, the required "reasonable grounds" based on "solid facts" are lacking. Heart-wrenching as any child-kidnapping obviously is, I cannot say there was an emergency here justifying a warrantless entry into appellant's home.

The record shows that, on the morning of October 24, 1989, when Detective Jenkins and his investigative team entered appellant's home, the officers were deemed to have had the five categories of information from the investigative file summarized in the majority opinion. *Ante* at 1166–67.[1] It is important, however, to add critical facts known to the officers which the majority has recited, *ante* at 1161–62, but has omitted from its legal discussion, *ante* at 1166–67, facts that undermine the majority's finding of probable cause.

Sergeant Denkins of the National Guard (a lunch-hour volunteer at D.C. General Hospital)—who had been watching the babies with her friend, Cornell Benjamin, and a first-time volunteer, "Karen," just before the baby was found missing—not only "failed to identify appellant as 'Karen' " on October 23, *ante* at 1166, but also provided testimony for the suppression hearing and at trial that appellant was heavier, shorter, and lighter-complected than "Karen," *ante* at 1161, and was not the woman with whom she remembered volunteering.[2] Sergeant Denkins further

---

1. Contrary to appellant's contention, I agree with the majority that, at the time Detective Jenkins and his fellow officers entered appellant's home on October 24, they were, as a matter of law, deemed privy to the so-called Hawkins information because it was part of the police investigative file. *Ante* at 1161 & n. 3, 1166, 1167 n. 14.

*See In re M.E.B.,* 638 A.2d 1123, 1128–33 (D.C. 1993).

2. Sergeant Denkins testified at trial. Her statements were presented at the suppression hearing through the testimony of Detective Jenkins.

testified at trial that when she had visited appellant's home with the officers a second time an hour later on October 23, she not only had "failed to identify the baby," *ante* at 1166, but also had explained to the officers that the baby missing from the nursery had unusual reddish, tapered hair, whereas the baby at appellant's home had browner, curlier hair. *Ante* at 1162. For these two reasons—positive, detailed nonidentifications both of appellant and of the baby as the putative kidnapper and victim, respectively—it is necessary, to say the least, that for the officers to have had probable cause (*i.e.,* reasonable grounds) to believe several hours later, on October 24, that appellant *was* the kidnapper, they must have had "solid facts" either repudiating these nonidentifications or at least effectively establishing probable cause in their own right, despite the nonidentifications. Such new, "solid facts" never came to light, leaving the majority with a flawed legal analysis.

### B.

For purposes of applying the emergency doctrine, my colleagues agree that the only reason the infant might have been "in danger of bodily harm," *Booth,* 455 A.2d at 1355, was the possibility that he was, indeed, the kidnapping victim. Indeed, everyone agrees that, but for this possibility, the infant appeared to be well cared for and safe on October 23. Appellant's room was equipped with nursery equipment and baby clothes, and Detective Jenkins, apparently satisfied with the baby's environment, told appellant that the baby would be returned to her if the infant could not be identified at the hospital. Moreover, confirming the detective's perception that the baby had not appeared to be in danger, Ms. Braxton, the nursing assistant, testified at trial that the infant "was all right" when the police brought him to the hospital.

This case, therefore, as the majority itself acknowledges, "is unlike the typical emergency exception case where blood at the scene, gunshots, or cries for help will give the police

'probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm,'" *ante* at 1167 (quoting *Booth,* 455 A.2d at 1355). Here, the emergency, if any, turned solely on the question whether the officers had probable cause to believe that the baby in appellant's home was the victim of a kidnapping. If there was such probable cause, then presumably, by the very fact of a kidnapping—a felony—the baby was in danger;[3] if, however, there was not probable cause, then from all appearances there was no danger, and thus no emergency.

Because the police viewed appellant as the only possible kidnapper (there were no other suspects), the question whether there was probable cause to justify a warrantless, emergency entry into appellant's home to save the baby, as a victim of kidnapping, was the same as the question whether there was probable cause to arrest appellant for kidnapping. As elaborated below, if there was not probable cause to arrest appellant, then there was not probable cause on the facts here to search her home.

### C.

It is theoretically true that the question whether there is probable cause to justify a search of particular property is different from the question whether there is probable cause to arrest the property owner; evidence of drug transactions, for example, at a particular location does not necessarily implicate any particular person. *See State v. Caicedo,* 135 N.H. 122, 599 A.2d 895, 897 (1991); *see generally United States v. Webster,* 750 F.2d 307, 318 (5th Cir.1984) (citing 1 LaFave, Search and Seizure § 2.1(b) (1978)); *United States v. Melvin,* 596 F.2d at 492, 495–96 (1st Cir.1979). It is also true that the police can have probable cause to search particular property for the fruits of a crime, reasonably suspecting the property owner committed the crime, but without having probable cause to arrest the owner; a reliable tip, for example, may warrant the search of particular premises for the instrumentalities of a bomb-

---

**3.** I agree with the majority's view that cases from "[o]ther jurisdictions have reflected the[] unique qualities of kidnapping in holding that kidnap- ping may create exigent or emergency circumstances, even without direct evidence of a threat of bodily harm to a victim." *Ante* at 1167.

ing without supplying enough cause to arrest the property owner unless and until the search reveals illegal firearms. *See Melvin,* 596 F.2d at 496; *see generally* W.R. LaFave & J.H. Israel, Criminal Procedure § 3.3, at 184–85 (1984).

This case, however, is different: there was no basis whatsoever, let alone probable cause, for the police to search appellant's home unless there was probable cause to believe appellant was a kidnapper—and thus subject to arrest as such. From all appearances, there was nothing about the baby in appellant's home that gave any cause for concern; there was no cause to search appellant's home, or any other home where a baby was known to live, unless there was probable cause to believe a particular occupant—in this case appellant—had committed a crime that changed the baby's status from safe to imperilled. In short, all the police information that aroused suspicion came from appellant, not from the baby; there was no ground for search independent of appellant's suspected status as a criminal. In this particular case, therefore, the two theoretically separate probable cause questions—to search and to arrest—merge; absent the latter, the former fails.

My colleagues cite decisional and treatise law for the unassailable proposition that probable cause to search and probable cause to arrest present theoretically separate questions. But they do not test this general proposition with the facts. They do not— and cannot—demonstrate that two different factual (and legal) analyses can be applied to the search and arrest questions here; their citation of theoretical legal principles is used to justify a finding of probable cause to search while creating a smokescreen to cover their operating assumption, *ante* at 1168–70, that the police did not have probable cause to arrest.

Before I address the facts showing why there was no probable cause to arrest (and thus no probable cause to search), it is critical to note, as the majority acknowledges, *ante* at 1168, that the prosecutor himself conceded at the suppression hearing that the police officers did not have probable cause to arrest appellant for kidnapping at the time they took her from her home to the Robbery Branch:

> I don't think probable cause for the arrest existed *at that time,*[4] *basically because of the fact that there had been the misidentification.*[5] [The officers] had to continue with their investigation. There had to be further questions of Ms. Oliver.

(Emphasis added.) For this reason alone— on the facts here—this court would have a sound basis for concluding there was no emergency; the Supreme Court itself, as the majority acknowledges, *ante* at 1168, has noted that a prosecutor's concession of no probable cause "precludes our considering" the record facts to determine whether the probable cause standard was actually satisfied. *Arizona v. Hicks,* 480 U.S. 321, 326 n.*, 107 S.Ct. 1149, 1153 n.*, 94 L.Ed.2d 347 (1987).

But even when looking at the facts, I conclude the prosecutor's assessment was correct. Contrary to the majority, I cannot say that, immediately before Detective Jenkins and the other officers entered appellant's home on October 24, they had "probable cause, based on specific, articulable facts," *Booth,* 455 A.2d at 1355, to believe that the baby was indeed the kidnapping victim and, thus, "in danger of bodily harm," *id.* It is true that, when the officers returned to appellant's home on October 24, Detective Jenkins had discovered that Howard University Hospital "employed no doctor named 'Worth' and that appellant had not been a patient at the hospital within the past five years." *Ante* at 1167. But, contrary to the majority

4. It is interesting to note that the prosecutor conceded there was no probable cause even after the police officers had confronted appellant in her home on October 24 with the information that Howard University Hospital had no Dr. Worth and showed no record of her delivery the previous day, and appellant had failed to respond to one more apparent lie, instead asking the police to leave her alone.

5. The prosecutor was referring to Sergeant Denkins' observations on October 23 that appellant was not "Karen," who had been in the nursery just before the kidnapping, and that appellant's baby was not the infant who had been taken from the hospital.

view, this discovery did not "dramatically change[ ] the whole equation." *Ante* at 1167. The majority implicitly acknowledges this much: despite the information previously received from Ms. Washington and Ms. Hawkins, *ante* at 1161 & n. 3, 1166–67, indicating that appellant had lied about the baby, Sergeant Denkins' very specific, unequivocal statements that appellant was not "Karen," the presumed kidnapper, and that appellant's baby was not the one taken from the hospital, were affirmative nonidentifications that effectively negated a finding of probable cause to search (or arrest). I cannot agree that the information learned from Howard University Hospital on October 24, while adding to suspicions about appellant, was enough—to the point of creating probable cause—to overcome Sergeant Denkins' express nonidentifications exonerating appellant the day before.

In the first place, this added information did not cause the "collapse of appellant's story." *Ante* at 1167. Rather, as the majority itself acknowledges two sentences later, "[t]he new information seemed to *confirm* the strange pattern of conduct reported by Ms. Washington and Ms. Hawkins," *ante* at 1167 (emphasis added); there was merely confirmation of what the police already knew from two other sources: appellant was a liar. The majority adds "[i]t would seem remarkable that a new mother would lie about where she gave birth." *Ante* at 1167. And yet the majority itself reports that appellant had earlier lied to Ms. Hawkins about the hospital where she had given birth and abandoned a baby. *Ante* at 1161 n. 3. Again, the October 24 lie was a lie no more remarkable than appellant's established pattern of lying. Sergeant Denkins had testified, however, that (despite such lies) appellant was not "Karen" and appellant's baby was not the one abducted. A cumulative lie did not erase the force of that exoneration.

Next, it may be true that "Sergeant Denkins had no reason whatever to think at the time of her earlier acquaintance with either Karen or the baby that she would be called upon to make a positive identification of either of them at a later time." *Ante* at 1167. But even if that were true, the fact is, at the

"later time" she was called upon to speak, Sergeant Denkins gave very specific nonidentifications. She may not have known she would be called on to identify "Karen" and the baby, but, despite that lack of awareness, she apparently did know, to a detailed certainty, who they were not.

Finally, the majority adds that, "given the shifting and uncertain personnel in the nursery, Karen was not the only individual who might have absconded with the infant." *Ante* at 1167. That is a pure makeweight. My colleagues are—with no discernible authority—taking judicial notice of a fact ("shifting and uncertain personnel") that the government has not "noticed" in presenting its arguments at trial or on appeal. To the contrary, the premise under which Detective Jenkins and his fellow officers—and later the prosecutor—were operating was that "Karen" was the kidnapper, and that there would not be a basis for entering appellant's home if appellant, in fact, were not "Karen."

Respectfully, I believe my colleagues find an emergency based on their understandable concern for finding a kidnapped baby, not because there were "solid facts" giving the police "probable cause" (*i.e.,* "reasonable grounds") to believe that the baby with appellant was a particular kidnap victim. As it turned out, of course, the baby was the kidnap victim, and this reality causes us all to say "Thank God he's safe." But, at least from my understanding of the Fourth Amendment, this reality has caused my colleagues, in effect, to say that this is the kind of case in which the emergency exception should be loosened or bent or reshaped—whatever it takes—to save a helpless stolen baby. But of course the Supreme Court repeatedly has warned that the seriousness of the offense under investigation cannot itself be a factor creating an emergency justifying a warrantless search. *See Thompson v. Louisiana,* 469 U.S. 17, 21, 105 S.Ct. 409, 411, 83 L.Ed.2d 246 (1984); *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732 (1984); *Payton v. New York,* 445 U.S. 573, 583–90, 100 S.Ct. 1371, 1378–82, 63 L.Ed.2d 639 (1980); *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978). By sustaining applica-

tion of the emergency doctrine for the warrantless search in this case, my colleagues are using the seriousness of a child-kidnapping to justify an otherwise impermissible entry into a private residence. This we cannot properly do. The Supreme Court has explained:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.... We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

The police, with their reasonable suspicions, were not without resources to check out the situation further, consistent with maintaining the child's safety and with the dictates of the Constitution. They could have tried, more effectively than they did, to obtain a third consensual interview with appellant. See *infra* Part II. If that failed, they could have attempted to obtain the assistance of appellant's brother in persuading appellant to tell the truth, to the point where the police had probable cause to believe that appellant was a kidnapper—or that she was not. To make this third approach to appellant and her brother more effective, the police could have arranged for visits by concerned hospital personnel, who had means of identifying the kidnapped baby. The police could have maintained a presence outside the home, as a deterrent to harm to the child

inside. Other strategies also might have proved profitable.

There was always a risk, of course, that harm could come to the child as long as he was within appellant's grasp and no one else's. But from the perspective of the law—indeed, the Constitution—this country has long subscribed to the principle that risks of harm inside a closed, private residence, whatever those risks may be, are tolerable when compared with the intolerable, warrantless invasions likely to occur unless "emergencies" excusing the warrant requirement are limited to those based at least on "solid facts," *ante* at 1166, giving rise to probable cause. In this case, there may have been reasonable suspicion, within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and succeeding cases; but because, on the facts here, there was no probable cause to arrest appellant for kidnapping, as the government concedes, there was no "probable cause,"—*i.e.*, there were no reasonable grounds to believe—"based on specific, articulable facts[ ] ... that immediate entry [was] necessary to assist someone in danger of bodily harm inside the premises." *Booth*, 455 A.2d at 1355–56. The police violated appellant's Fourth Amendment rights.[6]

## II. ALLEGED CONSENT TO THE WARRANTLESS ENTRY

Because the government, alternatively, has argued that appellant consented to police entry on October 24—which, if true, would obviate the need for a warrant (or for any discussion of the emergency exception)—I turn to that issue.

By justifying the warrantless entry under the emergency exception, my colleagues do not need to address the trial court's finding of a consensual police entry. It is reasonable to infer, however, that by ignoring the trial court's ruling, after remand, on an issue that logically precedes consideration of a nonconsensual, warrantless entry, my colleagues

---

6. Having concluded that *Booth's* "probable cause" requirement is not met here, I need not consider the other two *Booth* criteria the police officers had to satisfy; failure to meet any of the three precludes a warrantless entry under the emergency exception. *See Booth*, 455 A.2d at 1355–56.

manifest, at the very least, their skepticism about the trial court's ruling. In having to address the issue, I conclude, as a matter of law, that the trial court's crucial findings were clearly erroneous and that there was no consensual entry.

## A.

On April 22, 1994, we remanded the record to the trial court for supplemental findings of fact and conclusions of law as to "whether the police had received consent to enter appellant's home on October 24, 1989, and, if so, whether this consent extended to permit entry into appellant's bedroom in the basement." Specifically, we asked the trial court to "make findings of fact and conclusions of law, supported by evidence in the record," clarifying:

(1) whether anyone consented to the initial police entry into the house; and, if so, (2) who gave the consent; whether this person had authority to consent to the entry into the house; whether this consent, if given, also extended to entry into appellant's bedroom in the basement; and (3) in any event, whether consent to enter the house and appellant's bedroom could be imputed to appellant, including whether appellant herself consented to police entry into the house or into her bedroom.

On May 6, 1994, the trial court made the following supplemental findings of fact and conclusions and incorporated them in the record:

At about 11:00 a.m. October 24th, Detective Rufus Jenkins and other police officers visited Defendant's home.... The officers were met at the door by Defendant's brother, Lamard Oliver. The officers stated their desire to speak with Defendant. Mr. Oliver then called Defendant, apparently to inform her of the officers' presence after which Defendant inquired as to whether she should get dressed. Mr. Oliver then, with police officers following, proceeded down a stairwell to the basement of the house which apparently consisted of one large room.

\* \* \* \* \* \*

By proceeding to the basement of the house in apparent response to the police officers' expressed desire to speak with Defendant and continuing to the basement with the officers following, Mr. Oliver, thereby expressed his willingness to accommodate the officers by leading them to the basement for the purpose of speaking with his sister. By so doing, Mr. Oliver consented to entry into the house, including the basement area where Defendant was then located.

As a resident of the house, Mr. Oliver had apparent authority to admit others to areas not exclusively assigned to someone else. The area of the basement where Defendant was sleeping had apparently not been partitioned nor is there any indication that the basement in its entirety had been designated for Defendant's exclusive use.... Moreover the court finds that Defendant herself, though annoyed with the officers' persistence, nevertheless expressed her willingness to accommodate their desire to enter the basement to converse with her by simply asking if she should get dressed when she was called by her brother.

The court concludes that both Defendant and her brother consented to entry into the basement and that both had apparent authority to grant such consent.

We then gave the parties twenty days to file, simultaneously, memoranda on the trial court's supplemental findings and conclusions. In appellant's memorandum in response to the trial court's findings, she contends that (1) the trial court's factual findings are not supported by evidence in the record, and that (2) the trial court failed to hold the government to its burden of proving "clear and positive testimony" of consent that is "unequivocal and specific," *Judd v. United States,* 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951), because (a) Mr. Oliver's actions cannot justify entry under the doctrine of implied consent, and (b) Mr. Oliver lacked both actual and apparent authority to consent to entry of appellant's bedroom.[7]

---

7. In its supplemental memorandum, the govern-     ment asserts that "because appellant has never

I agree with appellant that the government failed to meet its burden of proving, with "clear and positive testimony," *id.*, that Mr. Oliver and/or appellant volunteered consent to police entry, free from "duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973).

### B.

I summarize, first, the law applicable when the government contends a person consented to a warrantless entry of the home. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh,* 466 U.S. at 748, 104 S.Ct. at 2096 (*quoting United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Because the warrant requirement protects the public from needless intrusions into the home, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586, 100 S.Ct. at 1380. In sum, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. at 1382.

An individual can waive the warrant requirement by consenting to a search and seizure. *See Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043; *Judd,* 89 U.S.App.D.C. at 65–66, 190 F.2d at 650–51. The government, however, must prove consent with "clear and positive testimony." *Judd,* 89 U.S.App.D.C. at 66, 190 F.2d at 651. Furthermore, consent must be "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058. Because "[i]ntimidation and duress are almost always implicit in such situations" where officers display their badges and declare their intentions to search, *Judd,* 89 U.S.App.D.C. at 66, 190 F.2d at 651, the government—to establish consent—must show more than the mere "acquiescence to a claim of lawful authority," *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); it must clearly establish the absence of intimidation and duress. *See Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058; *Judd,* 89 U.S.App.D.C. at 66, 190 F.2d at 651.[8]

---

challenged the legality of the officers' entry into the basement, she has doubly forfeited this issue—in the trial court and in this Court." I disagree.

Appellant moved to suppress her confession and the identification of the baby as the fruits of an unlawful search and seizure. Once appellant had shown that the entry and seizure occurred without a warrant, however, the burden of proving an exception to the warrant requirement shifted to the government. During the suppression hearing, the government argued that the "emergency exception" justified the warrantless entry and seizure of the baby. Because the trial court agreed with the government's argument, the court did not consider whether other exceptions to the warrant requirement, such as consent to entry, also applied.

On appeal, the government realized that we might not agree with the trial court that the *emergency exception justified the warrantless entry and seizure.* The government accordingly argued that, if we had doubts about application of the emergency exception, the government should be allowed to argue that consent justified the entry and seizure. We remanded the record at the government's suggestion for findings as to consent.

The burden of proving that free and voluntary consent authorized the initial entry always has remained with the government. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 221–22, 93 S.Ct. 2041, 2044–45, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). If there is any fault in the failure to present the consent issue until after the remand, it is the government's, for failure to be sure the trial court ruled on consent, in the alternative, at the suppression hearing.

8. From time to time, this court has relied on *Judd's* "clear and positive testimony" requirement as a correct statement of the law, remaining intact after *Schneckloth. See Martin v. United States,* 567 A.2d 896, 905 (D.C.1989); *Welch v. United States,* 466 A.2d 829, 844 (D.C.1983). *Judd's* additional requirement that consent be "unequivocal and specific," however, has been updated by *Schneckloth's* formulation that, based on examination of "all the circumstances," consent will be found if "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *see In re J.M.,* 619 A.2d 497, 500 (D.C.1992) (en banc). Thus, I apply the following standard drawn from *Judd* and *Schneckloth:* to prove consent, the government must provide "clear and positive testimony,"

This court treats findings of consent as factual determinations, reversible only if clearly erroneous. *See In re J.M.*, 619 A.2d 497, 500–01 (D.C.1992). A trial "court's findings are clearly erroneous 'to the extent that they fail to recognize [important] incidents and reject or fail to draw the inferences which we have found inescapable from the record.'" *Griffin v. City of Omaha*, 785 F.2d 620, 628 (8th Cir.1986) (quoting *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1203 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983)); *see Biggs v. Stewart*, 361 A.2d 159, 163 (D.C.1976) (trial court's findings are clearly erroneous when not "sufficiently comprehensive and pertinent to the issues as to provide a basis for the decision" or when not supported by evidence in record).

With these principles of law in mind, I turn to the evidence.

### C.

As to the initial police entry into the home, I conclude—as elaborated below—that the trial court's finding of consent is clearly erroneous for the following reasons: (1) The trial court failed to make findings as to what precisely occurred at the threshold of the house, despite remand of the record with clear instructions to do so. This omission necessarily reflects the government's failure to prove, with "clear and positive testimony," Mr. Oliver's or appellant's consent, free from "duress or coercion, express or implied." (2) Even if the trial court had fully credited Detective Jenkins' testimony that Mr. Oliver had admitted the officers to the house (which the court did not), that testimony could not support a finding of implied consent because (a) Mr. Oliver did not know that the police officers were outside before he opened the

door, (b) the officers never requested permission to enter the home, and (c) Mr. Oliver's merely walking away from the front door to speak to appellant, his sister, in another part of the house—apparently without any body gesture inviting entry—did not imply permission for the police to enter, rather than wait while Mr. Oliver consulted with appellant.

Detective Jenkins was the government's only witness at the suppression hearing who testified regarding the officers' initial entry into appellant's home on October 24. In addition, a defense witness, appellant's brother, Lamard Oliver, testified about the officers' entry. Through the testimony of these two witnesses, therefore, the government had the burden of showing that the officers crossed the threshold of the home with voluntary consent rather than the mere "acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 549, 88 S.Ct. at 1792. I cannot conclude that the government met its burden.

Both Detective Jenkins and Mr. Oliver agreed that Mr. Oliver answered the door in response to the officers' knock. After this point, however, their descriptions of what occurred differed significantly. Detective Jenkins described how the officers entered appellant's home as follows: "We told him that we were police officers, proper identification was shown and told him that we wanted to talk with Ms. Lisa Oliver.... [Mr. Oliver] admitted us in the house to come in. He stepped back from the door and admitted us into the hallway foyer at the home there."

Mr. Oliver described the same event differently: "They asked was Lisa home. I said, yes. And I said, 'I'll get her for you' and I went to get her. When I turned around, they was—they came on in the house." When cross-examined, Mr. Oliver denied that

*Judd*, 89 U.S.App. at 66, 190 F.2d at 651, such that, taking "all the circumstances" into consideration, the court finds consent was "voluntarily given, and not the result of duress or coercion, express or implied," *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Although it may appear to be a tautology, this court's shorthand for this formulation is "voluntary consent." This standard is consistent with, and reflects the means by which, the "government bears the burden of proving voluntary consent by a preponderance of the evidence." *Oliver v. United States*, 618 A.2d 705, 709 (D.C.1993) (citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), and *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974)). Any less clear proof would not sufficiently demonstrate that the suspect had not merely submitted to a show of authority, which of course "does not satisfy the government's burden of proof." *Id.* See also *Burton v. United States*, 657 A.2d 741, —— n. 5 (D.C. Dec. 12, 1994) (Schwelb, J., dissenting).

he had consented to the officers' entry by admitting them into the foyer:

Q: But you let them in, didn't you?

A: No, I didn't let them in. I opened the door for them.

Q: You opened the door for them?

A: Yes.

Q: All right. Then they walked in?

A: I answered the door, they walked in on their own.

Q: They didn't—did they have to brush by you physically?

A: No. I left to go get Lisa and when I came back, they was already in.

Q: Well, when you say you opened the door for them, sir, did you open the door, while they were—

A: No. If you knock on my door and I open the door to see who it is—

Q: Isn't it a fact that at no time did you tell them to stay outside?

A: I didn't tell them to stay outside.

Q: Isn't it a fact that you said, "Okay, Officers, come in, I'll get my sister", because you didn't think anything was wrong?

A: No, I didn't. I don't let the police in my house like that. Nothing.

Neither Detective Jenkins' nor Mr. Oliver's account of the initial entry on October 24 addressed who opened the screen door (the existence of which no one disputed). When discussing the entries that occurred on October 23, however, Mr. Oliver explained that, although he had left the front door open, the screen door was closed but unlatched.

Unfortunately, the trial court failed to make findings regarding the critical issue: what precisely occurred on October 24 at the threshold of the house. In fact, the trial court did not address how the officers entered the house. Instead, the trial court skipped to the point where the officers followed Mr. Oliver down the basement stairs:

The officers stated their desire to speak with Defendant. Mr. Oliver then called Defendant, apparently to inform her of the officers' presence after which Defendant inquired as to whether she should get dressed. Mr. Oliver then, with police officers following, proceeded down a stairwell to the basement which apparently consisted of one room.

How the officers happened to enter the house is clearly material to any finding of consent. Although usually a trial court's failure to make findings on a material issue requires remand, *see Tauber v. District of Columbia,* 511 A.2d 23, 28 (D.C.1986), there comes a point where the failure to make findings reflects the government's inability to prove its case, as opposed to the trial court's mere oversight in addressing the issue. Because the government did not explore the consent issue at the suppression hearing, and because we have already remanded the record specifically for findings of consent, and, further, because the government has not moved the trial court to clarify its findings before this court considers them after the remand, I believe we have reached that failure-of-proof point here. The trial court's failure to address the details of the officers' entry reflects the government's failure to present "clear and positive testimony" of voluntary consent, *Judd,* 89 U.S.App.D.C. at 66, 190 F.2d at 651, "not the result of duress or coercion, express or implied," *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058.

Indeed, even if the trial court had completely credited Detective Jenkins' testimony regarding the initial entry, I do not believe that this testimony could support a finding of voluntary consent. Detective Jenkins testified that Mr. Oliver "admitted us in the house to come in. He stepped back from the door and admitted us into the hallway foyer at the home there." Detective Jenkins never testified that Mr. Oliver opened the screen door or otherwise gestured in a manner that implied he was consenting to the officers' entry. Furthermore, nothing in Detective Jenkins' testimony suggested that the officers ever asked Mr. Oliver to enter the home. Instead, Detective Jenkins' conclusion that Mr. Oliver "admitted" the officers into the foyer was based solely on the fact that Mr. Oliver had stepped back from the door and had not objected once the officers had come inside.

Certainly, "consent to enter a house may be implied as well as expressed." *Terrell v. United States,* 361 A.2d 207, 210 (D.C.), *cert. denied,* 429 U.S. 984, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976) (quoting *United States v. Turbyfill,* 525 F.2d 57, 59 (8th Cir.1975)). Indeed, several courts, including this court, have concluded that opening a door and stepping back can constitute an implied invitation to enter. *See e.g., id.* (consent implied where officer knocked on door and identified himself as police officer, and codefendant opened door and walked back into room without saying anything); *United States v. Griffin,* 530 F.2d 739 (7th Cir.1976) (consent implied where defendant slammed door on officers after first time they knocked but then opened door and stepped back in response to second time they knocked); *Turbyfill,* 525 F.2d at 57 (consent implied where officers identified themselves, occupant opened door a few feet and stepped back, and officers opened unlocked screen door and entered house); *Robbins v. MacKenzie,* 364 F.2d 45, 48 (1st Cir.), *cert. denied,* 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966) (consent implied where officer identified himself and his desire to talk with defendant, and defendant responded, "Just a minute," unlocked and opened door, and then walked back inside room).

Unlike this case, however, these decisions concerned situations where the person opening the door already knew that police officers were outside. Thus, the action of opening the door and stepping back clearly showed an intent to admit (as opposed to merely a desire to see) the person on the other side. As the United States Court of Appeals for the First Circuit has explained:

When a householder, knowing the identity and purpose of his [or her] caller, opens his [or her] door and turns back inside, he [or she] expresses by his [or her] actions as adequate a consent to entry as he [or she] would by a verbal invitation. *To be distinguished are cases where a householder opens a door not knowing who is there and finds himself faced with armed authority. In such cases the act of opening the door may merely be to see who is there, and turning back may only be retreating.* But a police[ officer] who identifies himself [or herself] and his [or her]

purpose from the other side of a closed door has every reason to assume that the act of unlocking and opening the door, without more, is a consent to talk, and that the walking back into the room is an implied invitation to conduct the talking inside.

*Robbins,* 364 F.2d at 48 (emphasis added).

Furthermore, nothing in Detective Jenkins' testimony suggested that the officers ever asked Mr. Oliver if they could enter the home. Both Detective Jenkins and Mr. Oliver testified that, when Mr. Oliver answered the door, the police merely told him that they wanted to speak with appellant. As the United States Court of Appeals for the Ninth Circuit has noted:

We do not expect others to walk in to our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, creates an impression of authority to do so.

*United States v. Shaibu,* 920 F.2d 1423, 1427 (9th Cir.1990).

The facts of appellant's case are quite similar to the facts of *Shaibu.* In that case, four police officers buzzed Shaibu's apartment from the security gate. Over the intercom, Shaibu asked who was there. Although he received no response, he sounded the gate release, and the officers entered the apartment complex. As the officers were walking down the hall towards Shaibu's apartment, Shaibu opened his apartment door and went out to meet them. One of the officers asked Shaibu whether the suspect for whom they were looking was in his apartment. Shaibu turned and walked into the apartment, leaving the door open, and the officers followed him inside. The Ninth Circuit declined to find that Shaibu had given the officers implied permission to enter the apartment, because the police had never requested permission to enter. The court explained:

It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking in to a person's home without stopping at the door to ask permission.

\*      \*      \*      \*      \*      \*

We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent.

*Id.*, at 1427–28; *see Howard v. Pung*, 862 F.2d 1348, 1352 (8th Cir.1988) (act of stepping back while opening door not sufficient evidence of tacit consent), *cert. denied*, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989); *State v. Clark*, 844 S.W.2d 597, 599 (Tenn.1992) (no inference of consent where defendant stepped back after opening door, and officers entered without invitation). *But see United States v. Garcia*, 997 F.2d 1273, 1281 (9th Cir.1993) (inference of consent where trial court found that defendant interpreted officers' request to talk as request to enter, and defendant responded affirmatively to request and stepped back to clear way for officers' entry). Likewise, I believe that when the police do not specifically ask to enter a home, the resident's unequivocal, voluntary consent cannot be inferred merely from failure to object to the entry, at least when no body language indicates an invitation to enter.

### D.

The trial court's second major finding, that Mr. Oliver consented to the officers' entry into the basement, is also clearly erroneous. Once the trial court credited appellant's and Mr. Oliver's testimony that appellant "inquired as to whether she should get dressed," rather than crediting Detective Jenkins' testimony that appellant had invited the officers to "come on down," the court could not reasonably infer, without more, that Mr. Oliver voluntarily had consented to leading the male police officers into his sister's bedroom, knowing that she was not properly dressed. As I concluded with respect to the officer's initial entry into the house, Mr. Oliver's failure to object when the police followed him down the basement steps, without asking his permission to do so, cannot reasonably be the basis for inferring consent, rather than submission to the officers' authority.

Consider the record evidence. Once again, the trial court was faced with the conflicting testimony of Detective Jenkins and Mr. Oliver. In addition, appellant testified regarding the entry into her bedroom in the basement. All three witnesses agreed that Mr. Oliver called down to appellant to tell her that the police were there. Their testimony differed as to how appellant responded, however.

Detective Jenkins testified that appellant responded, "Have them come down." He explained that Mr. Oliver then told the officers, "Come on down," and they all went downstairs. Mr. Oliver, on the other hand, testified that appellant responded, "Should I put on clothes?" Mr. Oliver explained that when he walked down the stairs, two or three officers followed him. Appellant testified that when her brother came to the basement door and told her that the police were there, she told him that she was going to "put something on" and would come up to talk with them.

Although the trial judge did not specify which witness he credited, it is clear from the findings that he credited appellant's and Mr. Oliver's testimony that appellant asked whether she should get dressed; the judge did not credit Detective Jenkins' testimony that appellant and Mr. Oliver invited the officers to "come on down." The trial court's findings state:

> Mr. Oliver then called Defendant, apparently to inform her of the officers' presence after which Defendant inquired as to whether she should get dressed. Mr. Oliver then, with police officers following, proceeded down a stairwell to the basement of the house....

A finding of consent clearly would be warranted if the trial court had credited Detective Jenkins' testimony. Once the trial court credited Mr. Oliver's testimony that appellant "inquired as to whether she should get dressed," however, it follows that neither appellant nor her brother could be said to have voluntarily consented to the officers' entry into the basement. And yet the trial court concluded that both appellant and her brother consented to the entry:

By proceeding to the basement of the house in apparent response to the police officers' expressed desire to speak with Defendant and continuing to the basement with the officers following, Mr. Oliver thereby expressed his willingness to accommodate the officers by leading them to the basement for the purpose of speaking with his sister. By so doing, Mr. Oliver consented to entry into the house, including the basement area where Defendant was then located.... Moreover the court finds that Defendant herself, though annoyed with the officers' persistence, nevertheless expressed her willingness to accommodate their desire to enter the basement to converse with her by simply asking if she should get dressed when she was called by her brother.

Absent a request by the officers to enter, voluntary consent cannot be inferred merely from one's failure to object to the entry or, in this case, from walking away from the front door toward the basement to talk with appellant downstairs. More specifically, one cannot infer on this record that Mr. Oliver voluntarily consented to lead two or three male police officers into his sister's bedroom knowing she was not properly dressed. The only logical inference from these facts is that Mr. Oliver submitted to the officers' authority by failing to object when the officers followed him down the basement steps. Submission to authority cannot support a finding of consent. *See Schneckloth*, 412 U.S. at 233, 93 S.Ct. at 2050; *Bumper*, 391 U.S. at 548–49, 88 S.Ct. at 1791–92.

### E.

Finally, the trial court's finding that appellant herself consented to the officers' entry into the basement by "simply asking if she should get dressed when she was called by her brother" is also clearly erroneous. It is, in fact, a virtual non-sequitur; someone who is asked for an interview does not routinely invite the interviewer into her room while undressed. All that can reasonably be in-

ferred from appellant's inquiry is that she was not fully dressed. If anything else were inferable, it would be that appellant either would come upstairs to meet with the officers, after getting dressed, or would not consent to anyone's entry into the basement until she had had an opportunity to dress. *See United States v. Wenzel*, 485 F.Supp. 481, 483 (D.Minn.1980) ("Most persons when not fully clothed do not explicitly or impliedly consent to another person's entry."); *Walls v. Commonwealth*, 2 Va.App. 639, 347 S.E.2d 175, 179 (1986) (same).[9]

\* \* \* \* \* \*

Adopting the reasoning of *Shaibu*, I conclude it is inescapable from the record that the government failed to prove Mr. Oliver's voluntary consent to the initial entry into the home by clear and positive testimony. The trial court's finding that Mr. Oliver proceeded to the basement with the officers following, in the absence of additional factual findings regarding the basis for actual entry into the home, does not support the trial court's finding that Mr. Oliver consented to the initial entry. Furthermore, given the trial court's finding that appellant "inquired as to whether she should get dressed" rather than inviting the officers to "come on down," I also conclude it is "inescapable from the record" that neither appellant nor Mr. Oliver voluntarily consented to the officers' entry of the basement. The trial court's findings of consent, therefore, are clearly erroneous, and the warrantless entries into the house and bedroom cannot be justified on that ground.

### III.

As a consequence of the Fourth Amendment violation here—no emergency, no consent, no warrant—this court should order the trial court to suppress the resulting identification of the baby as the kidnapped infant. *See Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).[10] We also should order the trial court

---

9. Because I conclude that the trial court's consent findings are clearly erroneous, it is not necessary to address whether Mr. Oliver had apparent or implied actual authority to consent to the

officers' entry of appellant's bedroom in the basement.

10. The government's argument that appellant lacks standing to challenge the seizure, and thus

to suppress appellant's confession at the police station. *See id.* The government concedes that appellant was unlawfully arrested, absent probable cause at the time to believe she was the kidnapper. Her subsequent confession, after learning that the (unlawfully seized) baby had been identified—and after having conversations with her boyfriend and with her brother, Mr. Oliver—was not the result of sufficient attenuation of the taint from the warrantless entry, the unlawful arrest, and the seizure of the baby to justify admissibility of the confession. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Consequently, I would grant the motion to suppress, reverse appellant's convictions, and remand for further proceedings consistent with this opinion.

---

the subsequent identification, of the baby has no merit. First, appellant is not asserting the infant's Fourth Amendment rights; she is asserting her own rights in maintaining control and custody of the child. *See United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (seizure of luggage for 90–minutes without probable cause is unreasonable). Second, the Supreme Court has repeatedly recognized one's right to challenge seizures of goods unlawfully possessed. *See Hicks,* 480 U.S. 321, 107 S.Ct. 1149 (stolen goods); *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (drugs); *Warden v. Hayden,* 387 U.S. 294, 305–06, 87 S.Ct. 1642, 1649, 18 L.Ed.2d 782 (1967) ("we have given recognition to the interest in privacy despite the complete absence of a property claim by suppressing the very items which at common law could be seized with impunity"). No different rule applies to an allegedly stolen baby.

The government also contends that even if the entry was unconstitutional, the identification of the baby is admissible under *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), and *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). I disagree and take issue with my colleagues' musings about these decisions. *Ante* at —— n. 20. Here, the baby's out-of-court identification clearly was obtained through exploitation of the primary illegal entry, *see Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417, and was not at all attenuated from the purpose of the entry. *Compare Ceccolini,* 435 U.S. at 276–78, 98 S.Ct. at 1060–61 (witness' testimony not excluded because witness exercised free will in testifying and exclusion of her testimony would perpetually disable her from testifying about relevant and material facts regardless of how unrelated such testimony might be to purpose of original illegal search); *Crews,* 445 U.S. at 477, 100 S.Ct. at 1253 (in-court identification need not be suppressed as fruit of defendant's unlawful arrest when police's knowledge of defendant's identity and victim's independent recollection of defendant antedate the unlawful arrest and are untainted by it). Furthermore, enforcing the exclusionary rule in this situation will deter officers from proceeding in this manner in the future. *Cf. Ceccolini,* 435 U.S. at 280, 98 S.Ct. at 1062 ("[a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect" on the officer's behavior).