*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-729

MICHAEL C. BALL, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 05/24/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF2-18913-13)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued February 1, 2018                    Decided May 24, 2018)

*Sicilia C. Englert* for appellant.

*Chimnomnso N. Kalu*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, *Elizabeth Trosman, Suzanne Grealy Curt, Jennifer Fisch*er, and *Anwar Graves*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and EASTERLY, *Associate Judges*, and OKUN, *Associate Judge, Superior Court of the District of Columbia.*[*]

Opinion for the court by *Associate Judge* OKUN.

Dissenting opinion by *Associate Judge* EASTERLY at page 20.

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

OKUN, *Associate Judge, Superior Court of the District of Columbia*:    In this case, the police went to an apartment building at approximately 5 a.m. after receiving a radio run for an assault in progress.  When the police arrived at the apartment building, they were met by a resident who told the police that he had called 911 because he heard yelling and screaming coming from an apartment on the second floor.  The police went to the second floor of the apartment building and heard yelling and screaming coming from an apartment on that floor, which sounded like a distressed female yelling as if she were in pain or struggling.  The police knocked on the door and approximately one to three minutes later, a woman who looked panicked and concerned answered the door.  The woman opened the door halfway, but did not respond to the police officer's questions about what was happening inside the apartment.  The woman then looked back inside the apartment and opened the door, after which the police entered the apartment.

The trial judge found that exigent circumstances justified the police officers' entry into the apartment without a warrant, and denied appellant's motion to suppress the evidence they seized after entering the apartment.  Although the issue is a close one, we agree that exigent circumstances justified the warrantless entry into the apartment and the subsequent seizure of evidence.  Accordingly, for the reasons set forth more fully below, we affirm.

**I.**

Viewed in the light most favorable to the trial court's ruling,[1] the government's evidence at the suppression hearing showed the following. On October 26, 2013, at approximately 5 a.m., the police received a radio run for an assault in progress at 1626 28th Street, SE, Apartment 3. Officers Jeremy Kniseley and Domonick Davis responded to that location, where they were met at the front door of the building by a resident who told the police that he had called 911 because he heard yelling and screaming coming from Apartment 3 on the second floor of the building.[2] The police went to Apartment 3 and knocked on the door, but as they were knocking on the door of Apartment 3, they heard yelling and screaming coming from Apartment 4. More specifically, Officer Kniseley testified that he heard a "distressed female" "yelling as if she was in pain or struggling" and Officer Davis testified that he heard a lot of "commotion and going on" inside the apartment. In addition, the 911 caller, who had followed the police halfway up the steps to the second floor landing, pointed to Apartment 4 as the officers heard yelling and screaming coming from that apartment.

---

[1] *See, e.g., Wade v. United States*, 173 A.3d 87, 90 (D.C. 2017).

[2] The apartment building is a two story building, with two apartments on the first floor (Apartments 1 and 2) and two apartments on the second floor (Apartments 3 and 4).

Officer Kniseley then knocked several times on the front door of Apartment 4, identified himself as a police officer, and requested that the occupants open the door. After a period of one to three minutes had elapsed, a woman opened the front door halfway. According to Officer Kniseley, this woman was partially dressed and appeared "somewhat panicked and concerned," while Officer Davis testified that the woman was wearing a shirt and looked "more like in a daze." The officers asked the woman what was happening inside the apartment, but the woman did not respond and instead looked back into the apartment and then fully opened the door.

After the woman fully opened the door, the officers observed another woman inside the apartment, who appeared to be in the process of getting dressed. Officer Kniseley testified that he thought "some sort of sexual assault" had been occurring inside the apartment, based on the "yelling and screaming, and what [he] thought was distress," and based on his observations of the two partially dressed women inside the apartment.

After observing these two women and not receiving any responses to their questions, the officers entered the apartment and observed appellant, with his body

partially obscured behind a wall.[3] The police requested that appellant show his hands, but appellant refused to do so, and instead kept looking back towards the couch in the living room and then began reaching towards the couch. After the officers observed appellant reach towards the couch, Officer Davis wrestled appellant to the ground and both officers were able to handcuff him after a struggle that lasted one to two minutes. During the struggle, appellant repeatedly yelled "This is my house. I live here. This is my house." The couch in the living room moved from the wall as the result of this struggle, and when the officers stood up after handcuffing appellant, they observed a black handgun lying behind the couch. Officer Kniseley then recovered the gun, which the officer believed was loaded because it was "weighted" and "heavy."

---

[3] The record is not entirely clear as to appellant's location when the officers first observed him. Officer Kniseley testified that appellant was standing in the hallway behind the corner of a wall, and "repeatedly peeking out and retreating back and forth behind that corner," while Officer Davis testified that appellant was standing in the kitchen area "shielded by a wall" and that he could only see appellant's head and his right arm. The record also is not clear whether the officers observed appellant before they entered the apartment. Officer Davis testified that he saw appellant about ten seconds after he entered the apartment, while Officer Kniseley testified that he saw appellant before he entered the apartment, even though he testified that Officer Davis entered the apartment first. The trial court did not address this conflict in the testimony and we need not address this conflict either, and instead will assume, *arguendo*, that the police did not see appellant until after they entered the apartment.

After recovering the handgun, the police conducted a search of the remainder of the apartment to ensure their safety and the safety of the occupants. During this search, the police recovered one bag of marijuana from the top of a refrigerator, one bag of marijuana from a television stand in the living room, and a grinder with traces of marijuana on top of the couch. Appellant subsequently was charged with unlawful possession of a firearm, in violation of D.C. Code § 22-4503 (a)(1) (2012 Repl.), possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01 (a) (2012 Repl.), unlawful possession of ammunition, in violation of D.C. Code § 7-2506.01 (a), unlawful possession of a controlled substance (marijuana), in violation of D.C. Code § 48-904.01 (d) (2012 Repl.), and unlawful possession of drug paraphernalia, in violation of D.C. Code § 48-1103 (a).

Appellant filed a motion to suppress the evidence seized from his apartment, arguing that the evidence should be suppressed because the police entered his apartment without a warrant and without his consent. The government filed an opposition in which it argued that the police did not need a warrant to enter appellant's apartment because: (1) they were responding to an emergency situation in which they reasonably believed that the occupants in the apartment needed their assistance; and (2) the woman who answered the door had consented to the search.

The trial court conducted a hearing on appellant's motion to suppress the evidence seized from his apartment, at which both Officers Kniseley and Davis testified. At the conclusion of the hearing, the trial court denied appellant's motion, stating that she credited the testimony of the officers and finding that exigent circumstances justified the officers' warrantless entry into appellant's apartment and subsequent seizure of evidence.[4]

At appellant's first trial, the jury acquitted appellant of unlawful possession of drug paraphernalia and could not reach a unanimous verdict as to the other charges. The government subsequently dismissed the unlawful possession of marijuana charge prior to appellant's second trial. At the second trial, the jury convicted appellant of all three gun charges, and this appeal followed.

## II.

Appellant argues on appeal that the trial court erred in denying his motion to suppress evidence because there were no exigent circumstances justifying a warrantless search, and because appellant did not consent to a search of the

---

[4] The trial judge did not address the government's alternative argument that the woman who answered the apartment door had consented to a search of the apartment.

apartment. We need not address appellant's consent argument, because we find that exigent circumstances justified the warrantless search. *See, e.g., Oliver v. United States*, 656 A.2d 1159, 1164 n.11 (D.C. 1995) (not addressing consent argument after finding that search was justified under exigent circumstances doctrine).[5]

The Fourth Amendment of the U.S. Constitution "permits an officer to enter a dwelling without a warrant if the officer has 'an objectively reasonable basis for believing' that entry is necessary 'to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Evans v. United States*, 122 A.3d 876, 881 (D.C. 2015) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 406 (2006)). This exception to the warrant requirement, known as the "emergency aid exception," does not depend on "the seriousness of any crime [the officers] are investigating when the emergency arises," and instead "requires only 'an objectively reasonable basis for believing' that 'a person within [the dwelling] is in need of immediate aid.'" *Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (quoting *Brigham City*, 547 U.S. at 404-05; *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (internal citations omitted)); *see also Fisher*, 558 U.S. at 49 (the

---

[5] Appellant does not argue that the police could not properly seize his gun once they observed it lying on the floor behind the couch in his living room; appellant only challenges the warrantless entry into his apartment.

police do not need "ironclad proof of a likely serious, life-threatening injury" to

invoke the emergency aid exception).[6]  Furthermore, police officers do not have to

---

[6] Courts have recognized three related doctrines pursuant to which the police have been authorized to enter dwellings without a warrant:  the "exigent circumstances" doctrine, the "emergency aid" doctrine, and the "community caretaker" doctrine, and the differences among these doctrines have not always been clear.  *See, e.g., State v. Deneui*, 775 N.W.2d 221 (S.D. 2009).  We consider the emergency aid exception to fit within the broader category of exigent circumstances justifying entry into a dwelling without a warrant.  *See United States v. Booth*, 455 A.2d 1351, 1354 (D.C. 1983) (noting with approval that several courts have extended the exigent circumstances doctrine to include situations where "no crime assuredly has been committed," but "a person inside the premises is reasonably believed to be in peril"); *Oliver*, 656 A.2d at 1165 & n.12 (emergency aid exception is subset of exigent circumstances doctrine); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014) (same).

In *Booth*, *supra*, this court set forth the following test to be applied when the police enter a dwelling under the emergency aid exception:  (1) the police must have "probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm inside the premises"; (2) the entry must be "tailored carefully to achieve that objective"; and (3) the entry must not be "motivated primarily by the intent to arrest or search, but by an intent to investigate a genuine emergency and to render assistance."  455 A.2d at 1355-56.  The court has not decided whether these requirements are still applicable in light of *Brigham City*, *supra*, where the Supreme Court did not use the probable cause standard or consider the officer's subjective motivations, and instead stated that the police need an "objectively reasonable basis" for believing that emergency aid is needed, *Brigham City*, 547 U.S. at 406, and that the "officer's subjective motivation is irrelevant" in these circumstances.  *Id.* at 404.  We declined to address the potential implications of *Brigham City* in *Evans*, 122 A.3d at 881, and we likewise decline to address those implications in this case because appellant does not argue that the officers' subjective motivations were relevant in this case and because we will assume *arguendo* that the "objectively reasonable basis" standard is equivalent to the "probable cause" standard.

(continued …)

observe evidence of injuries before entering a premises pursuant to the emergency aid exception, because "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Id.* Finally, in evaluating the reasonableness of the police officers' actions, "the circumstances before [the officers] are not to be dissected and viewed singly; rather they must be considered as a whole. The totality of the circumstances -- the whole picture -- must be taken into account." *Oliver*, 656 A.2d at 1166 (quotations omitted).

For the following reasons, the officers in this case had an objectively reasonable basis for believing that they needed to enter appellant's apartment in order to provide emergency assistance to the occupants of that apartment. First, the officers received a call for an assault "in progress" at appellant's apartment building, so there was reason for the officers to believe that they were responding to a situation involving ongoing physical violence. Second, the information in the

---

(… continued)

The dissent faults the court for using the "fuzzy" objectively reasonable basis standard. We believe this criticism is misplaced for two reasons. First, the objectively reasonable basis standard is the standard adopted by the Supreme Court, and we are not in a position to criticize this formulation, "fuzzy" or otherwise. Second, the dissent also ignores the language used by this court in *Oliver*, where we explicitly interpreted probable cause in the emergency aid context to mean "reasonable grounds to believe," because that formulation "fits well with a perceived emergency, in contrast with a basis for a prospective arrest, for which 'probable cause' is the traditional language." 656 A.2d at 1166.

call was corroborated when the officers arrived at the apartment building and were met by the person who called 911 and told them he had called 911 because he heard yelling and screaming coming from an apartment on the second floor, and the 911 caller's reliability was enhanced by the fact that he did not remain anonymous but met the police at the apartment building. *See, e.g., United States v. Jenkins,* 329 F.3d 579, 581 (7th Cir. 2003) (911 call for assault in progress, when made by caller who identifies himself, can justify warrantless search under exigent circumstances exception); *cf. Joseph v. United States*, 926 A.2d 1156, 1161-62 (D.C. 2007) (upholding investigative stop and frisk based on 911 call from identified citizen, noting that "information from an identified citizen is presumptively reliable"). Third, this information was further corroborated when the officers went to the second floor and heard yelling coming from appellant's apartment, including the sounds of a woman who sounded as if she were yelling in pain. Fourth, when the officers knocked on the door of appellant's apartment, no one answered the door for a period of one to three minutes, and when a woman finally did answer the door, she appeared to be panicked and concerned. Fifth, the woman who answered the door did not respond to the police officer's questions about what was happening inside the apartment, and instead opened the door before the officers entered the apartment. Under these circumstances, it was

objectively reasonable for the police to believe that their assistance was needed to prevent injury, or further injury, to the occupants of appellant's apartment.

The cases cited by appellant do not dictate a different result. Indeed, these cases involved situations where the police did not have an objectively reasonable basis to believe there was an ongoing emergency in the premises they entered without a warrant. For example, in *Evans*, *supra*, the police entered an apartment without a warrant even though they had no objectively reasonable basis to believe that anyone in the apartment needed emergency aid, because the two participants in an alleged domestic violence incident both were being interviewed in a parking lot outside the apartment building at the time of entry, and because each person described a physical altercation that only involved the two of them. 122 A.3d at 881-82.

Likewise, in *Washington v. United States*, 585 A.2d 167 (D.C. 1991), the police received a radio call for a woman with a gun, went to an apartment where the woman who answered the front door of the apartment told the police that her sister had a gun and she wanted it out of the house, and the officers then proceeded down a hallway to a room that was identified as the appellant's room. *Id.* at 168. The officers knocked on the door and asked the occupant to come outside and,

after receiving no reply and waiting a few seconds, the officers forced the door open, breaking it off its hinges, and observed the appellant sitting peacefully on a bed with her three-year-old son. *Id.* at 168, 170. The police asked the appellant if she had a gun, and when she denied having one, the police removed the appellant's son from the room and searched the room, eventually finding a gun in a closed shopping bag on a shelf of the clothes closet. *Id.* at 168. This court, in a 2-1 opinion, reversed the trial court's denial of the appellant's suppression motion, finding that there were no exigent circumstances that justified a warrantless search of the room because the appellant was sitting "peacefully on a bed. Her hands were in plain view; [and] she was under the continuing scrutiny of a police officer." *Id.* at 170. Under these circumstances, where the officers had "taken effective control of the situation, and neither they nor any other persons here [were] threatened by the possibility that [appellant] would retrieve the gun and either use it or dispose of it," the court found that the police lacked exigent circumstances justifying their warrantless search of the appellant's room. *Id.*

This case stands in stark contrast to the situations the police confronted in *Evans* and *Washington*. Unlike *Evans*, this case did not involve a situation where the participants in an alleged domestic violence dispute were already outside the apartment and being interviewed by the police. Rather, in this case the police

heard yelling and screaming coming from the apartment they subsequently entered, including the sounds of a woman yelling as if she were in pain. And unlike *Washington*, the police in this case were not confronted with a situation where a woman was sitting peacefully on her bed with her three-year-old child when they entered the room and conducted a warrantless search. To the contrary, the woman who answered the door in this case looked panicked and concerned, did not answer the door until one to three minutes after the officers knocked on the door and announced their presence, and did not answer the officer's questions about what was happening inside the apartment. Thus, *Evans* and *Washington* present very different circumstances from this case and do not demonstrate that the police acted in an objectively unreasonable manner when they entered appellant's apartment without a warrant.

Appellant also argues that this court and the Supreme Court have upheld warrantless searches under the emergency aid exception only when there were stronger grounds to believe that emergency aid was needed. This argument has some force. Indeed, in *Booth*, *supra*, this court upheld a warrantless entry into the front hall of a rooming house where the person who answered the door had dried blood on his face and the person did not respond to the officer's questions about where the blood came from, 455 A.2d at 1356, and in *Earle v. United States*, 612

A.2d 1258, 1263-64 (D.C. 1992), we upheld a warrantless entry into a house where the police received a call for shots fired in or at the rear of the house, the officer waited for "quite some time" for someone to answer the door, and when someone finally answered the door, he behaved nervously, looked repeatedly back behind the door, refused to show his hands, and then tried to shut the door on the officer. Likewise, in *Brigham City*, *supra*, the Supreme Court upheld a warrantless entry where the police observed a fight occurring inside a house in which one of the occupants hit another in the face, sending the injured person to the sink, spitting blood. 547 U.S. at 406. Finally, in *Fisher*, *supra*, the Supreme Court upheld a warrantless entry where the officers saw blood on the hood of a truck outside a house, on clothes inside the truck, and on one of the doors to the house, and then observed an occupant inside the house, with a cut on his hand, screaming and throwing things. 558 U.S. at 45-46.

While each of these cases has indicia of exigent circumstances not present in this case, such as the observation of blood on an occupant or the observation of physical injuries being inflicted inside the dwelling, none of these cases either explicitly or implicitly required the observation of such injuries before the police can enter a dwelling pursuant to the emergency aid exception. To the contrary, such a requirement is inconsistent with the Supreme Court's admonition that "the

role of a peace officer includes *preventing* violence and restoring order, not simply rendering first aid to casualties." *Id.* at 49 (emphasis added). This requirement also is inconsistent with our own case law, in which we have upheld a warrantless entry under the emergency aid exception, without any evidence that the police had observed blood or physical injuries before entering the dwelling. *See Oliver*, 656 A.2d at 1167 (in kidnapping case, upholding warrantless entry without any evidence of "blood at the scene, gunshots, or cries for help").

Furthermore, numerous courts from other jurisdictions have found exigent circumstances in comparable situations where the police have received a report for yelling or screaming coming from a residence, and have not observed injuries to any of the occupants inside the dwelling prior to entry. *See, e.g., Commonwealth v. Davido*, 106 A.3d 611, 616-17 (Pa. 2014) (upholding warrantless entry where officers received 911 call for a "domestic situation" that involved a "man hitting a woman" and were informed en route to the residence that loud screaming had been heard from inside residence); *Jenkins*, 329 F.3d at 580 (upholding warrantless entry where police received 911 call for assault in progress and heard noise that sounded like a person standing up and falling down as they approached the front door); *State v. Sharp*, 973 P.2d 1171, 1175 (Ariz. 1999) (en banc) (upholding warrantless entry where person heard two screams coming from room on second

floor, along with pounding footsteps, and no one answered door when police knocked and announced their presence); *United States v. Barone*, 330 F.2d 543, 544 (2d Cir. 1964) (upholding warrantless entry where police heard "loud screams" coming from rooming house in the middle of night); *see also* 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.6 (a) at 608, 617-18 (5th ed. 2012) ("there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable," including situations where police "respond to what appears to be a fight within" the premises, and to "screams in the dead of night").

Appellant and the dissent argue that the police could have and should have obtained a warrant before entering appellant's apartment. However, in making this argument, appellant and the dissent conflate the justifications underlying the emergency aid exception with the rationales underlying the other exigent circumstance exceptions. More specifically, while the police need to reasonably believe that a crime has been committed before they can make a warrantless entry to prevent the imminent destruction of evidence, *Brigham City*, 547 U.S. at 403, or engage in "hot pursuit" of a fleeing suspect, *id.*; *see also Washington*, 585 A.2d at 169, there is no such requirement when the police instead are attempting to provide emergency aid to the occupant of a dwelling. *Booth*, 455 A.2d at 1354. Indeed, it is because the emergency aid exception is tied to the need to address an ongoing

emergency regardless of whether that emergency is the result of a crime, that we and other courts have noted that the police may enter a premises without a warrant if there is reason to believe that an occupant of the premises needs emergency assistance even if "no crime . . . has been committed." *Id.*; *see also Oliver*, 656 A.2d at 1165 ("Warrantless entry in an 'emergency' requiring preventive action may be permitted by the [emergency aid] exception if a person inside the premises is reasonably believed to be in danger even though no crime has necessarily been committed"); *Sutterfield*, 751 F.3d at 560 (emergency aid exception's defining characteristic is "urgency," not the existence of criminal conduct, and there is "no logical need to additionally consider probable cause and the availability of a standard criminal warrant" when considering the emergency aid exception); *People v. Hebert*, 46 P.3d 473, 479 (Colo. 2002) (emergency aid exception does "not require probable cause that contraband or other evidence of criminal activity is located at a particular place").

Finally, the dissent argues the fact that police heard women yelling in appellant's apartment did not justify their warrantless entry into the apartment, stating that "[p]eople make noises in their homes, including yelling; sometimes they yell very loudly." *Post* at 27. But, of course, in evaluating the reasonableness of the police's actions, context is everything – if the police heard the occupants of

appellant's apartment yelling in joy on a Sunday afternoon after the Redskins scored a touchdown, they assuredly would not have an objectively reasonable basis to enter the apartment without a warrant. But in this case, where Officer Kniseley heard a woman inside the apartment yelling not in joy, but as if she were in pain or struggling, where he heard this yelling occur at 5 in the morning, after receiving a call for an assault in progress, where an occupant in the building directed the police to the apartment and confirmed that he had called 911 because he heard yelling and screaming coming from the apartment, and where the woman who answered the door looked panicked and concerned – in that context, the reasonableness of the police actions looks quite different.[7]

Ultimately, as this court stated in *Oliver*, probable cause determinations in the emergency aid context do not emanate "from an antiseptic courtroom [or] a

---

[7] The court is constrained to note that the dissent repeatedly mischaracterizes both the scope and effect of the court's opinion, stating that it reduces the Fourth Amendment to a "nullity" *Post* at 21, and "demand[s] very little information" of the police before they enter a dwelling under the emergency aid exception. *Post* at 31. With all due respect, the court's opinion neither makes the Fourth Amendment a nullity nor demands that the police possess very little information before entering a dwelling in order to render emergency aid. Rather, the Court's opinion is a narrow one, which notes the closeness of the issue presented and which sets forth in detail the factors supporting the warrantless entry in this case. Contrary to the dissent's protestations, the boundaries of the emergency aid exception have not been drastically redrawn to allow warrantless entries based on "nothing more than speculation and forward momentum." *Post* at 36.

sterile library"; rather, they require a "pragmatic analysis of 'every day life on which reasonable and prudent men [and women], not legal technicians act." 656 A.2d at 1165-66 (internal quotation marks omitted). And with this framework in mind, we hold that the police lawfully entered appellant's apartment without a warrant because they had an objectively reasonable belief that they needed to enter the apartment to provide emergency assistance to an injured occupant or to protect an occupant from imminent injury.

## III.

For the reasons set forth above, the judgment of the trial court is affirmed.

*So ordered.*

EASTERLY, *Associate Judge*, dissenting: On the morning of his arrest, Mr. Ball was in the company of two female friends in what he thought was the privacy of his own home.[1] He was naked and the women were in some state of undress. The trio was loud. A downstairs neighbor called the police. The police responded and then entered his apartment, without permission and without a warrant. In protest, Mr. Ball cried out, "This is my house. I live here. This is my house." He seemed to think the police had no authority to barge into his home. I would have thought such an entry was precisely what the Fourth Amendment prohibits. The

---

[1] These undisputed facts are from the trial testimony.

majority opinion disagrees, interpreting the emergency aid exception to the Fourth Amendment's warrant requirement beyond the bounds of any precedent of the Supreme Court or this court. The majority opinion demands so little of the government to justify a warrantless entry into a home, it "reduce[s] the [Fourth] Amendment to a nullity and leave[s] the people's homes secure only in the discretion of police officers." *Johnson v. United States*, 333 U.S. 10, 14 (1948).

Although "[t]he Fourth Amendment protects the individual's privacy in a variety of settings[,] [i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home— a zone that finds its roots in clear and specific constitutional terms." *Payton v. New York*, 445 U.S. 573, 589 (1980). The Fourth Amendment states that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures[] shall not be violated." *Id.* at 584-85. As the Supreme Court has explained, "[t]hat language unequivocally establishes the proposition that at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* at 589-90 (internal quotation marks and brackets omitted); *see also id.* at 585 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").

The sanctity of the home is protected by strict adherence to the warrant requirement. "Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society," but "[t]he right of officers to thrust themselves into a home is also a grave concern, not only to the individual, but to a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson*, 333 U.S. at 14. Thus, as a rule,

> the Fourth Amendment has interposed a magistrate between the citizen and the police . . . . not . . . to shield criminals nor to make the home a safe haven for illegal activities . . . [but] so that an objective mind might weigh the need to invade the privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing, and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.

*Washington v. United States*, 585 A.2d 167, 168 (D.C. 1991) (quoting *McDonald v. United States*, 335 U.S. 451, 455-56 (1948)); *see also Payton*, 445 U.S. at 586, 602 (explaining that the warrant requirement "interpose[s] the magistrate's determination of probable cause between the zealous officer and the citizen" and "minimizes the danger of needless intrusions."). Entering a home without first

obtaining a warrant is "presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

There are exceptions to the warrant requirement, but these are "few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984). In particular, "[a]ny warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." *Kentucky v. King*, 563 U.S. 452, 470 (2011); *see also Brigham City*, 547 U.S. at 403 (the presumption that a warrant is needed to enter a home may be overcome only when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."). The emergency aid exception is one subset of exigent circumstances: "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City*, 547 U.S. at 403. But, clearly, the boundaries of this exception cannot be drawn so as to swallow the rule.

A critical means of cabining the exception is to hold the government to its burden of proof. Under our case law, the government must show that "the police [had] probable cause, based on specific, articulable facts, to believe that immediate

entry [wa]s necessary to assist someone in danger of bodily harm inside the premises." *United States v. Booth*, 455 A.2d 1351, 1355-56 (D.C. 1983)[2]; *see also*

_____

[2] *Booth* also directs consideration of the subjective intent of the police officer. 455 A.2d at 1354. The majority opinion acknowledges that "probable cause" is the standard under *Booth*, but notes that "[t]he court has not decided whether the[] requirements [of *Booth*] are still applicable in light of *Brigham City*." *Ante* note 6.

Although the subjective intent of the officers has never been an issue in this case, the parties agree that the Supreme Court in *Brigham City* made clear that courts may not consider the subjective intent of the officer in assessing whether the police made a lawful, warrantless entry to provide emergency aid. As for whether the probable cause standard of *Booth* is still good law, the government argued for the first time in its brief on appeal that the Supreme Court in *Brigham City* displaced *Booth* and indicated a lesser quantum of proof—"an objectively reasonable basis"—was required to authorize a warrantless entry under the emergency aid exception. But when pressed at oral argument about the meaning of this language, the government acknowledged, given that the police in *Brigham City* had seen a bloody fight in progress through a window and had at least probable cause to believe someone was in need of emergency aid, it was unlikely that the Court had meant to announce a new rule that called our probable cause requirement under *Booth* into question. The government then pivoted and argued that the police had probable cause to enter Mr. Ball's home.

The majority opinion "assume[s] *arguendo* that the 'objectively reasonable basis' standard is equivalent to the 'probable cause' standard," *ante* note 6, but persists in using the former, fuzzy language. The majority asserts it is bound to use this terminology because the Supreme Court has "adopted" it, *id*.; but, as explained above, it is unclear what the Supreme Court meant with the use of this language. Thus, in my view, we are bound to employ the standard as articulated by our court and consider whether the police had "probable cause," which we have specifically defined in this context. *Booth*, 455 A.2d at 1355; *Oliver v. United States*, 656 A.2d 1159, 1170 (D.C. 1995) (interpreting "probable cause" to require "reasonable grounds to believe based on specific articulable facts that immediate entry was necessary to assist someone in danger of bodily harm" quoting *Booth*); *see also id*. at 1166 (explaining that under our "probable cause" standard, "solid facts . . . not mere reasonable suspicion" is required).

(continued …)

*Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011) (explaining that in the Fourth Amendment hierarchy, a "hunch or gut feeling" is at the bottom rung, followed by "reasonable articulable suspicion," which is still "substantially less than probable cause"). After all, if police were authorized to enter a home based on less than probable cause to believe that someone inside is in need of aid, the Fourth Amendment's asserted protection for the home would be no meaningful protection at all.

The majority opinion does not hold the government to its burden. To justify the warrantless entry into Mr. Ball's apartment, the majority relies on information that patently does not amount to probable cause (or an objectively reasonable basis, *supra* note 2) to believe that someone was in need of emergency aid. The sum total of the evidence the majority opinion can muster is testimony that one officer

---

(… continued)

Even if "an objectively reasonable basis" were some quantum of information less than probable cause, what the police knew in this case before they crossed Mr. Ball's threshold would not suffice. *See, e.g.*, *Evans v. United States*, 122 A.3d 876, 881 (D.C. 2015) (declining to address "the potential implications of *Brigham City*" and concluding that "[e]ven applying a less stringent reasonable-belief standard, . . . the police did not have adequate reason to believe that immediate entry was necessary to provide emergency aid.").

heard a woman's voice unintelligibly yelling "as if she was in pain or struggling"[3]; that after the police knocked, identified themselves as police, and waited for a few minutes, a partially undressed woman answered the door; that according to one officer, the woman had a "somewhat panicked and concerned" look in her eye and quickly glanced into the apartment instead of answering when the officer asked if everything was okay[4]; and that, while standing at the threshold, the police also saw another partially dressed woman standing in the living room.[5] *Ante* at 10-11; *see also id.* at 3-4.

---

[3] In explaining the police's justification for making a warrantless entry, the majority opinion effectively counts many times over the same reason: the fact that disturbing noise was heard coming from the apartment. *Ante* at 10-11. But the majority opinion glosses over the fact that there were three different descriptions of this noise credited by the trial court. Only Officer Kniseley provided the description on which the majority opinion rests its analysis. By contrast, his partner, Officer Davis, whose testimony the trial court also credited, only heard what sounded like "commotion"; and both officers testified that the 911 caller said he heard yelling that sounded like a "fight." *See Evans*, 122 A.3d at 881 (for the proposition that "[t]he collective knowledge doctrine 'must apply equally to information augmenting or diminishing the objective basis the police have for conducting a seizure'" (citing *Turner v. United States*, 623 A.2d 1170, 1172 n.2 (D.C. 1993)).

[4] Officer Davis only perceived the woman who answered the door to be "in a daze."

[5] This narrative, presented for the first time at the suppression hearing a year-and-a-half after the arrest, is inconsistent with the affidavit in support of Mr. Ball's arrest. Other than noting the fact of a 911 call, it contains no information to support a determination that the police had probable cause to believe they needed to enter Mr. Ball's apartment to provide emergency aid. Instead, the *Gerstein* indicates that the police entered the apartment on consent.

Unquestionably, the information the police had before the door opened—unintelligible yelling "as if" an inhabitant of the apartment was struggling or in pain—did not give them probable cause to believe that someone was in need of emergency aid, and the majority opinion does not argue otherwise. *Ante* at 18-19 (relying on the yelling plus later-acquired "context"). People make noises in their homes, including yelling; sometimes they yell very loudly. If this is enough to justify a warrantless entry, then the Fourth Amendment's protections will turn on whether one has the luxury of owning a stand-alone home or whether one resides in an apartment or townhouse with shared walls. *But see United States v. Ross*, 456 U.S. 798, 822 (1982) (acknowledging that under the Fourth Amendment "the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion.").

To be sure, the police were fully justified in knocking on Mr. Ball's door and conducting an inquiry based on the unintelligible yelling. But, between knocking on the door and crossing the threshold of the home, the police did not gain sufficient additional information to give them probable cause to believe that

someone was in need of emergency aid.  Rather, after the door opened, the police

arguably moved further away from probable cause.[6]

Here, in response to police knocking, a woman came to the door.[7] Officer

Kniseley's perception that she had a somewhat "panicked and concerned look" on

---

[6] The majority opinion suggests that it is impermissible "dissection" to examine the totality of what the police knew along a timeline to determine whether the information they possessed ever rose to the level of probable cause so as to justify a warrantless entry to provide emergency aid—or whether their cause for mere suspicion remained static or even dissipated. *Ante* at 10 (citing *Oliver*, 656 A.2d at 1166).  But this is precisely what we have said courts should do in assessing the evidence known to the police. *Oliver*, 656 A.2d at 1165 (explaining that in assessing whether the police may make a warrantless entry under the emergency aid exception, "[f]acts . . . must be examined in the context and sequence in which they occur."). *See, e.g.*, *Washington v. United States,* 585 A.2d 167 (D.C. 1991) (discussed *infra* at 12-13); *Douglas-Bey v. United States*, 490 A.2d 1137, 1138 (D.C. 1985) (police had initial authority to make warrantless entry pursuant to emergency aid exception where they received a report of shooting at house and arrived to see the door ajar, making visible a shoe and a pool of blood; but police did not have authority to conduct a further search of the apartment without a warrant after they failed to discover anyone in need of assistance within).

[7] Thus this case is distinguishable from three of the four nonbinding decisions from other jurisdictions the majority opinion cites to support its holding in the absence of supporting precedent from the Supreme Court or this court. *Ante* at 16-17 (citing *United States v. Jenkins*, 329 F.3d 579 (7th Cir. 2003); *Commonwealth v. Davido*, 106 A.3d 611 (Pa. 2012); *State v. Sharp*, 973 P.2d 1171 (Ariz. 1999) (*en banc*)).  In those cases, police suspicion only heightened because no one came to the door to open it when the police arrived to conduct their inquiry. *Jenkins*, 329 F.3d at 580; *Davido*, 106 A.3d at 616-17; *Sharp*, 973 P.2d at 1175.

her face was consistent with an individual being understandably surprised and concerned to be confronted by police at the door at 5 a.m. Her glance back into the apartment without immediately responding to the police was similarly ambiguous under the circumstances.[8] *See Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991) (explaining that "there are limits to the inference that an experienced reasonable police officer can rationally draw" and that if the information available to the police "is capable of too many innocent explanations, then the intrusion cannot be justified").

Even construing these facts as providing some corroboration that something was wrong in the apartment, the government did not have probable cause to believe they needed to enter Mr. Ball's apartment to provide emergency aid. We must also factor in what the police did *not* see. *Ante* at 10 (acknowledging that "the totality of the circumstances—the whole picture—must be taken into account"). The police saw nothing to confirm their suspicion that there was an assault in progress. Neither woman visible to the police from the threshold appeared to be "in pain or struggling," bleeding or bruised, crying or upset, or in

---

[8] *Cf. Robinson v. United States*, 76 A.3d 329, 338-39 (D.C. 2013) (reaffirming that citizens have the right not to speak to the police).

any apparent physical danger. There was no sign of broken objects, upended furniture, or any evidence of a struggle or physical altercation.[9] In sum, after the woman opened the door to the apartment, Officer Kniseley's guess that a woman had been yelling because she was being physically assaulted was still just a guess.

None of this court's prior cases support the majority opinion's broad conception of police authority to enter a home without a warrant based on mere speculation that someone may need emergency aid; instead they make clear that far more is required. The majority opinion resists the constraints of our precedent by attempting to show both that (1) the cases in which this court rejected warrantless entries based on the emergency aid exception, like *Evans v. United States*, 122 A.3d 876 (D.C. 2015) and *Washington v. United States*, 585 A.2d 167 (D.C. 1991), are distinguishable on their facts, and (2) cases in which we have upheld such

---

[9] In the fourth nonbinding case cited by the majority opinion, *United States v. Barone*, the Second Circuit held long before *Payton* or *Brigham City* that the police were authorized to enter an apartment after hearing screams from inside. 330 F.2d 543, 544 (2d Cir. 1964). But even in that case, the police had greater cause for concern: after knocking on the door, they were asked repeatedly by a male voice to identify themselves, but they were then greeted at the door by a woman with no sight of the man. *Id.* at 545. In this case the police heard yelling "as if" a woman was struggling and in pain and then were greeted at the door by a woman and saw another woman behind her in the apartment. The police had no reason to believe anyone else was in the apartment.

warrantless entries, like *Oliver*, 656 A.2d 1159, actually demand very little information when applying the probable cause standard. These efforts are unpersuasive.

It is immaterial that the facts of *Evans* and *Washington* do not mirror the facts of this case. The salience of these decisions comes from this court's refusal to endorse surmise and speculation as a basis for warrantless entry under the emergency aid exception. In *Evans*, the police tried to search an apartment when the only two known occupants, "participants in an alleged domestic violence dispute," were already outside being interviewed by other officers. *Ante* at 12. But this court found a Fourth Amendment violation because "the police had no specific reason to believe that an unknown third party was in the apartment and in need of emergency aid." *Evans*, 122 A.3d at 882. The same is true is in this case. Upon seeing two women through the open apartment door, the police had no reason to believe that there was a third person inside who either might be in need of assistance or might place the two women in imminent danger. *Supra* note 9.

In *Washington* the police actually had more particularized information than they had in this case about the potential danger: they were responding to a report

of a woman with a gun and the defendant's sister, having let them into the home, told them she wanted the gun "out of the house." 585 A.2d at 168. Nevertheless this court held that, once the police had seen that the sister was "in the living room by herself, out of harm's way," they no longer had "specific articulable facts" to believe that anyone was in immediate danger such that they were authorized to break down the door to the defendant's separately locked room and make a warrantless entry.[10] *Id.* at 172. The court held the police should have "ceased their search immediately, or inquired into the nature of the weapon and the reason [the sister] called the police before proceeding." *Id.* *Washington* reaffirms both that the police may not rely on a speculative need to provide emergency aid to enter a home without a warrant and that when the police obtain information that contradicts or does not meaningfully buttress their speculation that someone is in need of emergency aid or imminent danger, they cannot simply plow forward,

---

[10] Quoting an earlier part of the court's opinion addressing a different exception to the warrant requirement (not the emergency aid exception later discussed), the majority opinion suggests that this court's holding in *Washington* was narrower—that the court only determined that the police once in defendant's bedroom could not proceed to search the room after they saw the defendant sitting with her son on the bed. *Ante* at 12-13; 585 A.2d at 170. Even if this had been the court's holding, it would support suppression in this case, given that the police in this case likewise saw nothing once the apartment door opened to substantiate their suspicion that any one was in need of emergency aid. In fact, however, as discussed above, when conducting its analysis under the emergency aid exception, this court expressly held that the forcible entry into the defendant's bedroom was not authorized.

entering first and asking questions later. They must abide by the constraints of the Fourth Amendment and conduct any continuing investigation from the threshold.

*Washington* and *Evans* do not stand alone in our case law in affirming that the emergency aid exception to the warrant requirement is narrowly interpreted and reserved for situations where the police have probable cause to believe there is a true emergency. Indeed, the majority opinion has no choice but to concede that the argument that our prior cases have demanded "stronger grounds to believe that emergency aid was needed . . . has some force." *Ante* at 14-15 (discussing *Booth*, 455 A.2d 1351, and *Earle v. United States*, 612 A.2d 1258 (D.C. 1992), and acknowledging "each of these cases has indicia of exigent circumstances not present in this case, such as the observation of blood on an occupant or the observation of physical injuries being inflicted inside the dwelling."). But the majority opinion looks to *Oliver v. United States*, 656 A.2d 1159, 1167 (D.C. 1995), to demonstrate that the requisite probable cause showing to believe someone is in need of emergency aid is not as demanding as this body of precedent indicates. *Ante* at 16 (citing *Oliver* for the proposition that this court has "upheld a warrantless entry under the emergency aid exception, without any evidence that the police observed blood or physical injuries before entering the dwelling."). *Oliver*, however, does not support the majority opinion's loose interpretation of the

emergency aid exception to the warrant requirement: *Oliver* provides more authority to call this interpretation into question.

In *Oliver*, the police were investigating the kidnapping of an eighteen-day old infant from a hospital; over the course of a day of investigation, including two visits to the defendant's apartment, they developed information that gave them probable cause to believe that the "helpless and defenseless" newborn boy was there. 656 A.2d 1167. In that context—where the police knew a crime had been committed, they had a suspect, and the only question was whether the victim, a newborn baby, could be said to be in need of emergency aid so as to justify the police's warrantless entry into the apartment to retrieve him—the court acknowledged that "it is true that this case is unlike the typical emergency exception where blood at the scene, gunshots, or cries for help will give police 'probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist someone in danger of bodily harm.'" *Id.* The court then explained that the departure from this norm was justified by "the unique qualities of kidnapping" which "may create exigent or emergency circumstances, even without direct evidence of a threat of bodily harm to the victim." *Id.* (explaining that "kidnapping investigations present unusually compelling circumstances for emergency analysis" because "the life, freedom, and future of a

human being is at stake" and that kidnapped infants "in particular" are especially vulnerable). Far from dispensing with the requirement that the police need "direct evidence of a threat of bodily harm"—like "blood at the scene, gun shots or cries for help"—to justify a warrantless entry under the emergency aid exception, *Oliver* confirms that in cases that do not involve kidnapping, such "direct evidence" *is* required. *Oliver* demonstrates that the search in this case was unlawful.

Without precedent from this court, the majority opinion tries to find support for its expansive interpretation of the emergency aid exception in the Supreme Court's statement that the "role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Ante* at 10, 16 (quoting *Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (quoting *Brigham City*, *Utah v. Stuart*, 547 U.S. 398, 406 (2006))). But *Michigan v. Fisher* provides a dubious foundation for the majority opinion's holding, given that the police in that case actually observed "violent behavior." Specifically, the police saw (first through a window, then through an open door) that Mr. Fisher was "rag[ing]," "screaming and throwing things" inside his house and had already cut his hand, leaving blood on the hood of his truck. *Id*. at 45, 48. Based on these observations, the Supreme Court determined that "it was reasonable [for the police] to believe that [Mr.] Fisher had hurt himself . . . and needed treatment that in his rage he was unable to

provide," or that he "was about to hurt . . . someone else." *Id.* at 49. Similarly, in *Brigham City*, the only other case in which the Supreme Court has upheld a warrantless entry under the emergency aid exception, the police observed a fight in the house through a kitchen window and saw one individual get punched in the face and then spit blood in the sink while others in the room attempted to restrain the assailant from continuing the attack. 547 U.S. at 401. The majority opinion cannot credibly assert that the Supreme Court's conception of the emergency aid exception to the warrant requirement encompasses the warrantless, nonconsensual entry into Mr. Ball's apartment.

By affirming a warrantless home entry in this case based on nothing more than speculation and forward momentum, the majority opinion is redrawing the boundaries of Fourth Amendment protection for the home and diminishing its protection. The majority opinion denies this, asserting that its fact-specific analysis is "narrow." *Ante* note 7. But given that the facts it cites do not support—either on their own terms or under our case law—a determination that the police had probable cause to believe anyone in Mr. Ball's apartment was in need of emergency aid, I cannot agree. I see no limiting principle to the majority opinion's analysis. Rather, it effectively endorses the use of the emergency aid exception to justify warrantless investigative searches of homes.

The rationale for this retrenchment of Fourth Amendment protections for the home appears to be that the right to privacy must yield to the needs of law enforcement to prevent crime.[11] But the Supreme Court has already rejected such overreaching reasoning in the investigative context:

> The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

*Mincey*, 437 U.S. at 393. This limit on police powers cannot be circumvented in the name of hypothetical crime prevention.

---

[11] The majority opinion asserts that "[a]ppellant and the dissent argue that the police could have and should have obtained a warrant before entering his apartment" and in so doing "conflate the emergency aid exception with rationales underlying the other exigent circumstance exceptions." *Ante* at 17. I take no position as to whether the police could have obtained a warrant. My point is that they had no authority to enter Mr. Ball's home without one. And this determination is not based on any "conflation" of exceptions to the warrant requirement; it is premised on the constitutional rule that if the police do not have consent and do not legitimately fall under any exception to the warrant requirement, they cannot enter a home without a warrant. *Supra* at 22-33.

The majority opinion gives too little regard to the "precious" protection the Fourth Amendment affords the home against intrusion by government agents. *Washington*, 585 A.2d at 168. Courts bear the responsibility to set limits to ensure that the goals of law enforcement and peace keeping do not automatically override Fourth Amendment protections afforded to the home. Until now, this court has consistently held that more than speculation, if not actual evidence of injury or imminent danger, is required to support a determination that the police had probable cause to enter a home without a warrant to provide emergency aid. We should adhere to this precedent—not redraw the boundaries of this previously narrow exception to the warrant requirement so as to authorize an otherwise illegal entry. We should hold that the warrantless, nonconsensual search in this case was invalid. And we should uphold Mr. Ball's Fourth Amendment privacy rights in his home. I respectfully dissent.